UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NANCY LARA-GRIMALDI, individually and
as Administratrix of Estate of Alexandra
Grimaldi,

                  Plaintiff,

    -v-

COUNTY OF PUTNAM, DONALD SMITH,
KAREN JACKSON, A. VILLANI, STEPHEN
NAPOLITANO, CRIS STEWART, JOHN AND
JANE DOES, et al.,

                  Defendants.

No. 17-CV-622 (KMK)

OPINION & ORDER

Appearances:

Keith M. Szczepanski, Esq.
Beldock Levine & Hoffman LLP
New York, NY
*Counsel for Plaintiff*

James A. Randazzo, Esq.
Portale Randazzo LLP
White Plains, NY
*Counsel for Defendants County Of Putnam, Donald Smith, Karen Jackson, A. Villani, and Stephen Napolitano*

Drew W. Sumner, Esq.
Morris Duffy Alonso & Faley
New York, NY
*Counsel for Defendants County Of Putnam, Donald Smith, Karen Jackson, A. Villani, and Stephen Napolitano*

Jonathan E. Symer, Esq.
Law Offices of James A. Steinberg
Poughkeepsie, NY
*Counsel for Defendant Christopher Stewart*

Ellen A. Fischer, Esq.
Steinberg & Symer, LLP
Poughkeepsie, NY
*Counsel for Defendant Christopher Stewart*

KENNETH M. KARAS, United States District Judge:

Plaintiff Nancy Lara-Grimaldi ("Plaintiff"), individually and as Administratrix of the

Estate of Alexandra Grimaldi ("Grimaldi"), brings the instant Action against the County of

Putnam ("Putnam County"), Putnam County Sheriff Donald Smith ("Smith"), Sergeant Karen

Jackson ("Jackson"), Correction Officer A. Villani ("Villani"), Correction Officer Steven

Napolitano ("Napolitano," and together "County Defendants"), and Nurse Christopher Stewart

("Stewart," and together with County Defendants, "Defendants"), for wrongful death of

Grimaldi. (*See generally* Compl. (Dkt. No. 1).)[1] Plaintiff brings eight claims: (1) federal claims

under 42 U.S.C. § 1983 against Smith, Jackson, Villani, Napolitano, and Stewart (together,

"Individual Defendants") for violations of Plaintiff's First, Eighth, and Fourteenth Amendment

Rights; (2) federal claims under 42 U.S.C. § 1983 against Putnam County for the aforementioned

Constitutional violations; (3) federal claims against Putnam County for violations of Title II of

the ADA, 42 U.S.C. §§ 12131–12134, and the Rehabilitation Act, 29 U.S.C. § 794; (4) state law

wrongful death claims against the Individual Defendants; (5) state constitutional law claims

under Article I § 12 against the Individual Defendants; (6) state law negligence claims against

the Individual Defendants; (7) state law claims of negligent hiring, training, and supervision

---

[1] Defendant "Cris" Stewart appears to actually be named "Christopher" Stewart. (*See* Def. Stewart's Mem. of Law in Supp. of Mot. To Dismiss ("Def. Stewart's Mem.") 1 (Dkt. No. 32).) The Clerk of the Court is requested to update the docket caption accordingly.

against Putnam County; and (8) state law respondeat superior claims against Putnam County. (*See generally id.*)

Before the Court is Stewart's Motion To Dismiss the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Stewart Motion"), (*see* Dkt. No. 31; Def. Stewart's Mem. of Law in Supp. of Mot. To Dismiss ("Def. Stewart's Mem.") (Dkt. No. 32)), and County Defendants' Motion To Dismiss the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "County Defendant's Motion"), (*see* Dkt. No. 34; Cty. Defs.' Mem. of Law in Supp. of Mot. To. Dismiss ("Cty. Defs.' Mem.") (Dkt. No. 36)).

For the reasons that follow, the Motions are granted in part and denied in part.

## I.  Background

The following facts are taken from the Complaint and are accepted as true for the purposes of this Motion.  At the time of the events described herein, Grimaldi was a pre-trial detainee at Putnam County Correctional Facility ("PCCF").  (*See* Compl. ¶¶ 34, 84(a).)

### A.  Factual Background

Grimaldi resided in the Town of Carmel, County of Putnam in New York State.  (*Id.* ¶ 8.) According to Plaintiff, Grimaldi's mother and Administratrix of the Estate of Alexandra Grimaldi, (*id.* ¶ 9), "Grimaldi began struggling with an opioid addiction in or about 2012," (*id.* ¶ 27).  Her "first arrest for heroin possession occurred in Putnam County in or about 2012."  (*Id.* ¶ 28.)  "Grimaldi was subsequently arrested on approximately five other occasions for heroin possession and/or possession of a hypodermic needle."  (*Id.* ¶ 29.)  "Grimaldi had been detained at PCCF on at least three prior occasions, most recently in December 2014."  (*Id.* ¶ 37.)  Sadly,

on October 28, 2015, Grimaldi hanged herself in her cell at PCCF.  (*Id.* ¶ 2.)  She was 23 years old.  (*Id.* ¶ 8.)

"On October 27, 2015, at approximately 3:30 p.m., after having lunch with her father, her aunt, and her uncle, . . . Grimaldi was waiting outside of her father's home for a cab when an unmarked Town of Kent Police Department car arrived."  (*Id.* ¶ 30.)  "[T]he officers had a warrant for . . . Grimaldi's arrest for violating the terms of her probation."  (*Id.* ¶ 31.)  During a search incident to the arrest, the officers "found a hypodermic needle and a bag of marijuana."  (*Id.* ¶ 32.)  Grimaldi was charged with violating the terms of her probation, possession of a hypodermic needle, and criminal possession of marijuana.  (*Id.* ¶ 33.)  After being taken into custody, Grimaldi was transported to the Kent Justice Court, where she was arraigned and remanded to PCCF.  (*Id.* ¶ 34.)  Upon arrival at PCCF, Grimaldi was sent to the Putnam Hospital Center ("PHC") "to receive treatment for a knee injury she sustained prior to being taken into custody."  (*Id.* ¶ 35.)  Following treatment, she "was transported back to PCCF, where she was processed."  (*Id.* ¶ 36.)

At PCCF, Napolitano conducted an intake interview of Grimaldi.  (*Id.* ¶ 42.)  Plaintiff alleges that "[u]pon information and belief . . . Grimaldi told . . . Napolitano that she had previously attempted suicide, that she injected heroin within the last day, and that she suffered from mental health issues, including bipolar disorder."  (*Id.* ¶ 43.)  During the interview, Napolitano filled out New York State Commission of Correction Screening Guidelines ("Screening Guidelines") Form 330 ADM.  (*See* Decl. of James A. Randazzo, Esq. ("Randazzo Decl.") Ex. B ("Form 330 ADM"), at 1 (Dkt. No. 35).)[2]  In "Column A," Napolitano checked

_____

[2] The Court may consider documents incorporated by reference into the Complaint when

boxes indicating Grimaldi had a "history of drug or alcohol abuse," noting heroin was last used on "10/26;" a "history of counseling or mental health evaluation/treatment," noting "bi-polar;" and "previous suicide attempt," noting it was "4 yrs ago." (*Id.*) "Napolitano recommended 'routine supervision' for . . . Grimaldi while she was incarcerated at PCCF." (Compl. ¶ 44; *see also* Form 330 ADM, at 1.)[3] Jackson then reviewed the intake form and suicide prevention form prepared by Napolitano and allegedly "concurred with Napolitano's recommendation to provide . . . Grimaldi with 'routine supervision,' despite knowing that . . . Grimaldi informed . . . Napolitano that she had previously attempted suicide, suffered from mental health issues, and had recently injected heroin." (Compl. ¶ 45.) Grimaldi was then examined by Stewart. (*Id.* ¶ 46.) Plaintiff alleges "Stewart also agreed with . . . Napolitano's recommendation for 'routine supervision,' despite knowing that . . . Grimaldi informed . . . Napolitano that she had previously attempted suicide, suffered from mental health issues, and had recently injected heroin." (*Id.* ¶ 47.) Plaintiff asserts that the "grossly inadequate response to . . . Grimaldi's need for a heightened form of supervision as a result of her previous suicide attempt, mental health issues, and recent drug use constitutes a policy of deliberate indifference to serious medical/psychiatric needs of incarcerated people at PCCF and ultimately resulted in her suicide." (*Id.* ¶ 48.)

---

deciding motions to dismiss. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("In considering a motion to dismiss . . . a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.").

[3] According to County Defendants, routine supervision requires inmates to be checked every thirty minutes. (County Defs.' Mem. 3 n.4.)

Plaintiff contends that "[d]uring previous detentions at PCCF, when . . . Grimaldi reported the same physical and mental health conditions, she was placed on a heightened supervision schedule." (*Id.* ¶ 41.) Plaintiff also alleges "[u]pon information and belief, the PCSD ["Putnam County Sheriff's Department"] Correction Officers working at PCCF knew . . . Grimaldi and knew that she struggled with opioid addiction and mental health issues, including bipolar disorder." (*Id.* ¶ 38.) Additionally, "Grimaldi's case file at PCCF included information about her previous arrests for possession of heroin and/or a hypodermic needle, her mental health issues, which included a bipolar disorder diagnosis, and information about her previous suicide attempt." (*Id.* ¶ 39.) And, "[d]ocuments from . . . Grimaldi's prior incarcerations at PCCF include handwritten medical requests made by . . . Grimaldi that state, 'NEED MEDS GOING CRAZY!,' 'HELP ME!,' and 'CAN'T SLEEP! NEED MY MEDS! PLEASE! ASAP!'" (*Id.* at ¶ 40.)

The next day, on October 28, 2015, Villani allegedly "reviewed . . . Grimaldi's charges and case file while completing an 'Inmate Classification Points Sheet.'" (*Id.* ¶ 49.) Plaintiff avers that "Villani did not properly calculate . . . Grimaldi's classification, which resulted in a higher score." (*Id.* ¶ 50.) According to Plaintiff, had Villani properly calculated Grimaldi's "prior misbehavior and disciplinary infractions at PCCF, she would have received a lower classification score and additional supervision from correction officers." (*Id.* ¶ 51.)

Plaintiff contends that "in the late morning or early afternoon of October 28th . . . Grimaldi began to suffer from heroin withdrawal symptoms." (*Id.* ¶ 52.) Allegedly, "in the early afternoon . . . Grimaldi cried out for help to PCSD Correction Officers who were monitoring her area of the PCCF, but those calls went unanswered." (*Id.* ¶ 53.) Plaintiff alleges

"[u]pon information and belief, the withdrawal symptoms . . . Grimaldi experienced were treatable if they had been acted upon by PCSD Correction Officers and/or PCCF medical officials." (*Id.* ¶ 54.) However, "the PCCF Correction Officers and medical officials did nothing to address [Grimaldi's] withdrawal symptoms." (*Id.* ¶ 55.)

"[A]t approximately 3:20 p.m., . . . Grimaldi hanged herself on her cell bars with a bedsheet that was issued to her by PCCF." (*Id.* ¶ 56.) "[A]t least 15–20 minutes later, PCSD officers found . . . Grimaldi, unresponsive, hanging from the cell bars with a bedsheet issued by PCCF tied around her neck." (*Id.* ¶ 57.) Plaintiff alleges that "PCSD Correction Officers did not check on . . . Grimaldi for a significant length of time prior to finding her hanging from her cell bars." (*Id.* ¶ 58.)

"[A]fter finding . . . Grimaldi . . . PCSD Correction Officers untied the bedsheet." (*Id.* ¶ 59.) "Grimaldi was not breathing and her heart was not beating." (*Id.* ¶ 60.) PCSD Correction Officers then "provided lifesaving procedures," which "were successful in resuscitating" Grimaldi, and "made a call for Emergency Medical Technicians." (*Id.* ¶¶ 61–62.) Grimaldi was transported to PHC by ambulance and placed in the Intensive Care Unit "where she was connected to a respirator to assist with her breathing and [a] tube was inserted into her trachea." (*Id.* ¶¶ 63–64.) "At PHC, several PCSD Officers were stationed in . . . Grimaldi's room and the area directly outside her room," (*id.* ¶ 67), and "[a]t least one officer interfered with family members' access to . . . Grimaldi and refused to move in order to allow access to her bedside," (*id.* ¶ 68).

On or about November 1, 2015, Grimaldi was transferred from PHC to Westchester

Medical Center ("WMC"), (*id.* ¶ 72), where she "was slowly taken off of the respirator and was able to breathe on her own," (*id.* ¶ 73). On or about December 18, 2015, Grimaldi was transferred to Helen Hayes Rehabilitation Hospital, (*id.* ¶ 74), where "the tube that had been inserted into . . . Grimaldi's trachea at PHC was removed," (*id.* ¶ 75). In or about late January or early February 2016, Grimaldi was moved to Tarrytown Hall Care Center. (*Id.* ¶ 76.) "On or about May 13, 2016, . . . Grimaldi passed away at WMC as a direct result of the injuries she sustained at PCCF." (*Id.* ¶ 77.)

Plaintiff alleges that "approximately four days after . . . Grimaldi was found hanging in her cell, another female detainee attempted suicide at PCCF." (*Id.* ¶ 78.) Plaintiff avers that "the supervision provided at PCCF is deliberately indifferent to the physical and mental health needs of the people incarcerated at the correctional facility and, as a result, two incarcerated people have recently attempted suicide." (*Id.* ¶ 79.)

Plaintiff seeks "compensatory damages for . . . Grimaldi's wrongful death, psychological and emotional distress, and other financial loss caused by" Defendants' alleged actions, "punitive damages to deter such intentional or reckless deviations from well settled constitutional law," and "costs and attorney's fees." (*Id.* ¶ 3.) Plaintiff alleges that "Defendants' conduct caused . . . Grimaldi to suffer physical, mental, emotional and financial injuries, deprived her of her constitutional rights, resulted in her wrongful death, and resulted in the loss of decedent's familial relationships, comfort, protection, companionship, love, affection, solace, and moral support." (*Id.* ¶ 80.) In addition to these damages, Plaintiff also asserts she entitled to recover the reasonable value of funeral and burial expenses. (*Id.*)

B.  Procedural Background

Plaintiff filed the instant Complaint on January 26, 2017.  (*See* Compl.)  On May 18, 2017, Stewart sought leave to file a Motion To Dismiss.  (*See* Dkt. No. 25.)  Plaintiff filed a letter in opposition.  (*See* Dkt. No. 26.)  On June 2, 2017, County Defendants sought leave to file a Motion To Dismiss.  (*See* Dkt. No. 28.)  Plaintiff again filed a letter in opposition.  (*See* Dkt. No. 29.)  The Court held a premotion conference on June 8, 2017 and adopted a Scheduling Order for Stewart's and County Defendants' Motions.  (*See* Dkt. No. 30.)  Pursuant to the Scheduling Order, on July 27, 2017, Stewart filed his Motion To Dismiss and accompanying Memorandum of Law and declaration, (*see* Dkt. No. 31; Def. Stewart's Mem.; Decl. Jonathan E. Symer, Esq. ("Symer Decl.") ¶ 13 (Dkt. No. 32)), and on July 28, 2017, County Defendants filed their Motion To Dismiss and accompanying Memorandum of Law, declaration, and exhibits, (*see* Dkt. No. 34; Cty. Defs.' Mem.; Randazzo Decl.).  On September 15, 2017, Plaintiff filed Memorandums of Law in Opposition to County Defendants' and Stewart's Motion.  (*See* Pl.'s Mem. Law in Opp. to Cty. Defs.' Mot. To. Dismiss ("Pl.'s Cty. Defs.' Mem.") (Dkt. No. 38)); Pl.'s Mem. Law in Opp. to Def. Stewart's Mot. To. Dismiss ("Pl.'s Stewart Mem.") (Dkt. No. 39)).  On October 6, 2017, County Defendants and Stewart each filed a Reply Memoranda of Law.  (*See* Cty. Defs.' Reply Mem. of Law in Supp. of Mot. To. Dismiss ("Cty. Defs.' Reply Mem.") (Dkt. No. 41); Def. Stewart's Reply Mem. of Law in Supp. of Mot. To. Dismiss ("Def. Stewart's Reply Mem.") (Dkt. No. 42).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous

departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B.  Analysis

1. First Cause of Action – Deliberate Indifference Claims Against Individual Defendants

Because Grimaldi was a pre-trial detainee rather than a convicted prisoner at the time she was denied adequate medical care, (*see* Compl. ¶¶ 34, 84(a)), Plaintiff's claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment," *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).[4]  A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections

---

[4] Until recently, "[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody [were] analyzed under the same standard irrespective of whether they [we]re brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009), *overruled by Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).

available to a convicted prisoner." *Id.* (quoting *City of Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

"While in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide' resulting from a pre-existing mental health disorder." *Case v. Anderson*, No. 16-CV-983, 2017 WL 3701863, at *8 (S.D.N.Y. Aug. 25, 2017) (quoting *Kelsey v. City of New York*, 306 F. App'x. 700, 702 (2d Cir. 2009)). "'A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement'—such as the denial of mental health care—'by showing that the officers acted with deliberate indifference to the challenged conditions.'" *Case*, 2017 WL 3701863, at *8 (quoting *Kelsey*, 306 F. App'x. at 702). To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that the "deprivation of medical care . . . [was] 'sufficiently serious,'" and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.'" *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

---

However, the Second Circuit's recent decision in *Darnell*, 849 F.3d 17, overruled *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 35.

Stewart's suggestion that Grimaldi was a "probation violator detainee/convict" and not a pre-trial detainee," and thus the Eighth Amendment should apply to Plaintiff's claim, (*see* Def. Stewart's Mem. 3–5), is unsupported by the record. Grimaldi was arrested for and charged with violating the terms of her probation and charged with crimes based on the items found on her following a search incident to her arrest. (Compl. ¶¶ 31–34.) Grimaldi had not yet been found guilty of those charges.

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Darnell*, 849 F.3d at 30 (internal quotation marks omitted). Analyzing this objective requirement involves two inquiries: "[t]he first inquiry is whether the prisoner was actually deprived of adequate medical care," *Salahuddin*, 467 F.3d at 279, and the second "asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. To meet the objective requirement, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his [or her] health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (same). Generally, the condition must be "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Grimmett v. Corizon Med. Assocs. of New York*,

13

No. 15-CV-7351, 2017 WL 2274485, at * 3 (S.D.N.Y. May 24, 2017) (quoting *Chance*, 143 F.3d at 702)).

The second requirement is the "mens rea prong."[5]  "Prior to the Second Circuit's decision in *Darnell*, 849 F.3d 17, the second element—whether the defendant acted with a sufficiently culpable state of mind—was evaluated subjectively."  *Ryan v. Cty. of Nassau*, No. 12-CV-5343, 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018) .  However, in *Darnell*, in light of the Supreme Court's decision in *Kingsley v. Henderickson*, 135 S. Ct. 2466 (2015), the Second Circuit held that when a claim arises under the Fourteenth Amendment, "the pretrial detainee must prove that the defendant-official acted intentionally," in depriving adequate medical care "or recklessly failed to act with reasonable care . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849 F.3d at 35; *see also Ryan*, 2018 WL 354684, at *3 (same); *Charles v. Cty. of Orange, New York*, No. 16-CV-5527, 2017 WL 4402576, at *10 (S.D.N.Y. Sept. 29, 2017) (same).  "In other words, the second element of a deliberate indifference claim under the Fourteenth Amendment 'is defined objectively,' and a plaintiff is not required to show subjective awareness by the defendant that '[his] acts (or omissions) have subjected the pre-trial detainee to a substantial risk of harm.'"  *Ryan*, 2018 WL 354684, at *3 (quoting *Darnell*, 849 F.3d at 35).[6]  Despite the slightly lower

_____

[5] In *Darnell*, the Second Circuit indicated that this prong should be referred to the "mens rea prong," rather than the subjective prong, to prevent confusion.  *See Darnell*, 849 F.3d at 29 (italics omitted).

[6] While *Darnell* involved claims of unconstitutional conditions of confinement, several courts in the Second Circuit have extended Darnell's holding to claims of deficient medical treatment.  *See, e.g.*, *Ryan*, 2018 WL 354684, at *3 n.1; *Grimett*, 2017 WL 2274485, at *4 n.2; *Smith*, 2017 WL 4417699, at *3; *see also Charles*, 2017 WL 4402576, at *10 ("This standard for deliberate indifference applies to any underlying violation of the due process clause, such as for

14

standard articulated in *Darnell*, which is akin to objective recklessness, "any § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." *Smith*, 2017 WL 4417699, at *3 (quoting *Darnell*, 849 F.3d at 36) (italics omitted); *see also Ryan*, 2018 WL 354684, at *3 (same); *Grimmett*, 2017 WL 2274485, at *4 (same). "A detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36.

### a. County Defendants Napolitano and Jackson

Napolitano and Jackson concede that Plaintiff has plausibly pled the objective element for purposes of the present Motion. (Cty. Defs.' Mem. 5.) Napolitano and Jackson instead argue that the mens rea prong has not been satisfied because Grimaldi's statements to Napolitano regarding her recent heroin use, bipolar disorder, and previous suicide attempt did not establish that Grimaldi was at risk to attempt suicide or require her to be placed on constant supervision, and by following the Screening Guidelines, Napolitano's and Jackson's decision to place Grimaldi on routine supervision was reasonable under the circumstances. (*See id.* at 5–7; Cty. Defs.' Reply Mem. 1–5.)

Plaintiff does not allege Napolitano and Jackson intentionally deprived Grimaldi of adequate medical care. However, Plaintiff has plausibly alleged enough facts to suggest Napoitano and Jackson "recklessly failed to act with reasonable care . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to

---

maintaining unconstitutional conditions of confinement or failing to provide adequate medical care to a person in state custody, 'because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.'") (quoting *Darnell*, 849 F.3d at 33 n.9.)

health or safety." *Darnell*, 849 F.3d at 35.  Plaintiff alleges that Napolitano assessed Grimaldi during the intake interview, and was informed that Grimaldi had "previously attempted suicide, suffered from mental health issues, and had recently injected heroin."  (*See* Compl. ¶¶ 42–43.) Plaintiff alleges Jackson reviewed the intake form, which noted the previous suicide attempt, mental health issues, and recent heroin use, and concurred with Napolitano's recommendation. (*See id.* ¶ 45; Form 330 ADM, at 1.)[7]  Napolitano and Jackson, however, point out that Napolitano also noted that Grimaldi did not show signs of depression, did not appear to be anxious, panicked, afraid or angry, did not display unusual behaviors, did not appear to be under the influence of alcohol or drugs, and did not show signs of withdrawal.  (*See* Cty. Defs.' Mem. 6 (citing Form 330 ADM, at 1); Cty. Defs.' Reply Mem. 3–4.)  Based on the information Grimaldi provided, Napolitano and Jackson argue the Screening Guidelines did not recommend

---

[7]  Plaintiff also alleges "the PCSD Correction Officers working at PCCF knew . . . Grimaldi and knew that she struggled with opioid addiction and mental health issues, including bipolar disorder," (*id.* ¶ 38), that "Grimaldi's case file at PCCF included information about her . . . mental health issues, which included a bipolar disorder diagnosis, and information about her previous suicide attempt," (*id.* ¶ 39), and that "[d]ocuments from . . . Grimaldi's prior incarcerations at PCCF include handwritten medical requests made by . . . Grimaldi that state, 'NEED MEDS GOING CRAZY!,' 'HELP ME!,' and 'CAN'T SLEEP! NEED MY MEDS! PLEASE! ASAP!,'" (*id.* ¶ 40).  Plaintiff does not allege that any of the named Defendants specifically had access to this information; thus, the Court does not consider these allegations in determining whether Napolitano or Jackson "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.
    Plaintiff also alleges that as Grimaldi began to suffer from heroin withdrawal symptoms, "Grimaldi cried out for help to PCSD Correction Officers who were monitoring her area of the PCCF, but those calls went unanswered," (*id.* ¶ 53), and "the PCCF Correction Officers and medical officials did nothing to address the withdrawal symptoms," (*id.* ¶ 55).  Here, too, Plaintiff does not allege that any of the named Defendants specifically had access to this information; thus, the Court does not consider these allegations in determining whether Napolitano or Jackson "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

16

anything above routine supervision, and thus Napolitano's recommendation was constitutionally firm.  (*See* Cty. Defs.' Mem. 6; Cty. Defs.' Reply Mem. 3–5.)

"[F]ollowing *Darnell*, the Court is faced with a difficult task.  It is called upon to determine, without the benefit of medical expertise, whether an objectively reasonable person in Defendant[s'] position would have known, or should have known, that Defendant[s'] actions or omissions posed an excessive risk of harm to [Grimaldi]."  *Davis v. McCready*, No. 14-CV-6405, 2017 WL 4803918, at *8 (S.D.N.Y. Oct. 23, 2017).  The Court cannot find that Plaintiff's claim that Napolitano and Jackson knew or should have known of Griamldi's suicide risk based on the information they had and that providing Grimaldi with only routine supervision was not reasonable care, with all reasonable inferences drawn in Plaintiff's favor, fails to state a plausible claim for deliberate indifference.  *See, e.g.*, *Thomas v. Ashcroft,* 470 F.3d 491, 497 (2d Cir. 2006) (reversing the dismissal of a prisoner's complaint that alleged the defendants ignored his serious medical needs despite being made aware of them); *Case*, 2017 WL 3701863, at *11 (noting that the "[p]laintiff has alleged that the officers involved at each juncture had some level of awareness of [the decedent's] mental illness.  Thus, to provide no treatment would be to ignore a serious medical need, and to delay treatment would be to run the very risk of self-harm that reasonably prompt treatment was designed to avoid." (citations omitted)); *Silvera v. Connecticut Dep't of Corr.*, 726 F. Supp. 2d 183, 192 (D. Conn. 2010) (denying a motion to dismiss despite "a disagreement about the proper course of treatment," for mentally ill pre-trial detainee because the defendants "recklessly ignored the risk that [the decedent] would attempt to harm himself"); *Allah v. Kemp,* No. 08-CV-1008, 2010 WL 1036802, at *6 (N.D.N.Y. Feb. 25, 2010), *adopted by* 2010 WL 1035657 (N.D.N.Y. Mar. 18, 2010) (denying a Rule 12(c) motion, rejecting the

defendants' arguments that failure to take more affirmative steps to prevent the plaintiff from attempting suicide was, at most, a mistake "in their exercise of psychiatric judgment" (internal quotation marks omitted)); *Estate of Rodriguez v. Simon,* No. 06-CV-125, 2007 WL 2154238, at *5 (D. Vt. Mar. 30, 2007), *adopted sub nom. by* 2007 WL 2107542 (D. Vt. July 19, 2007) (denying a motion to dismiss and rejecting the defendants' argument that placing a pretrial detainee on 15–minute checks, and nothing more, was a reasonable response to the risk that the detainee would harm himself).

"The Court does not doubt that individuals in the Defendants' positions face difficult decisions on a daily basis regarding how to respond appropriately to a detainee's serious mental health needs." *Silvera*, 726 F. Supp. 2d at 192. Moreover, it is axiomatic that if the evidence demonstrates that the Napolitano and Jackson reacted reasonably to Grimaldi informing them that she had mental health issues, had used heroin, and previously attempted suicide by following the Screening Guidelines and placing her on routine supervision, they cannot be held liable for the tragedy that ultimately transpired. *See Farmer*, 511 U.S. at 844–45 (noting that "prison officials who act reasonably cannot be found liable"). Nonetheless, the Court is unable to conclude at this early stage—and on the basis of the Complaint alone—that the Napolitano and Jackson were not deliberately indifferent to Grimaldi's serious mental health needs. *See id.* at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways . . . ."); *Chance,* 143 F.3d at 703 ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.").

Napolitano and Jackson argue that even if Plaintiff has stated a substantive due process claim, they are nonetheless shielded by qualified immunity. (Cty. Defs.' Mem. 11–13; Cty. Defs.' Reply Mem. 6–7). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[Qualified] immunity protect[s] government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (second alteration in original) (citation and internal quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in Defendants' position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of

19

the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and internal quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 665 (citations and internal quotation marks omitted). Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

Given that "qualified immunity is not only a defense to liability, but also provides immunity from suit," a court should resolve a "defendant's entitlement to qualified immunity . . . 'at the earliest possible stage in litigation.'" *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016) (quoting *Pearson*, 555 U.S. at 231–32). "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," but "a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004)). As a result, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept [that] . . . the plaintiff is entitled to all reasonable

inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* at 436 (internal quotation marks omitted).

While in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide. *See Watts v. New York City Police Dep't*, 100 F. Supp. 3d 314, 327 (S.D.N.Y. 2015); *Case*, 2017 WL 3701863, at *8; *see also Kelsey*, 306 F. App'x at 702. Defendants point to the Supreme Court's decision *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), holding that "[n]o decision of th[e Supreme] Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of th[e Supreme] Court even discusses suicide screening or prevention protocols." *Id.* at 2044. However, the claims against Defendants are "about more than [Putnam] County's allegedly inferior mental health screening process," but deal with the fact that "once a jail has actual or constructive notice that an inmate is in danger of committing suicide due process requires the jail to take reasonable measures to abate that danger." *Case*, 2017 WL 3701863, at *16 (internal quotation marks omitted); *see also id.* ("The holding in *Barkes* is . . . not in tension with a finding that a detainee has a clearly established right to protection from serious risks of harm, including suicide."); *Bays v. Cty. of Montmorency,* No. 15-CV-10534, 2016 WL 1728569, at *3 n.1 (E.D. Mich. May 2, 2016) ("*Barkes* is distinguishable from the case at hand because, unlike here, it was 'undisputed that neither petitioner had personally interacted with [the decedent] or knew of his condition before his death.'") (quoting *Barkes,* 135 S. Ct. at 2043)); *Weishaar v. Cty. of Napa,* No. 14-CV-1352, 2016 WL 7242122, at *11 (N.D. Cal. Dec. 15, 2016) (finding that when considering the issue of qualified immunity in this context, "the pivotal question . . . might be phrased thus: On the 'particular facts' of this case, in this 'specific context,' did [the detainee]

21

pose a 'serious risk of suicide' so that any 'reasonable,' 'competent' officer would have known that they could not be 'deliberately indifferent' to his plight, and that by failing to do more than they did to protect him from suicide . . . they were clearly violating his constitutional rights?" (citation omitted)).

The Court must decide whether it was "objectively reasonable" for Defendants "to believe that [their] actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (internal quotation marks omitted). More specifically, the question here is whether it was objectively reasonable for Napolitano and Jackson to believe that placing Grimaldi on routine supervision was constitutionally sufficient. "But whether particular acts are objectively reasonable . . . is a highly fact-specific inquiry." *Allah v. Kemp*, No. 08-CV-1008, 2010 WL 5860290, at *10 (N.D.N.Y. Nov. 9, 2010), *adopted by* 2011 WL 705210 (N.D.N.Y. Feb. 22, 2011). Whether Napolitano and Jackson's conduct was objectively reasonable in light of Grimaldi's history of mental health issues, recent heroin use, and prior suicide attempt "turns on disputed questions of fact." *Kaminsky v. Rosenblum*, 929 F.2d 922, 927 (2d Cir. 1991). Thus, the Court declines to conclude at this time that Napolitano and Jackson are entitled to qualified immunity. *See Case*, 2017 WL 3701863, at *18 ("[The p]laintiff has made sufficient allegations of deliberate indifference to [the decedent's] serious medical needs, and, based on those allegations, the [c]ourt will infer at this stage that the officers did not make reasonable but mistaken judgments, but instead made reckless decisions in violation of the clearly established law in this Circuit." (internal quotation marks and citation omitted)); *Allah*, 2010 WL 1036802, at *7 (declining to "conclude that [the d]efendants are entitled to qualified immunity at this stage," because "[r]esolution of qualified immunity depends on the determination of certain

factual questions that cannot be answered at this stage of the litigation" (internal quotation marks omitted); *Estate of Rodriguez*, 2007 WL 2154238, at *8 ("[T]he law regarding which preventative measures are objectively reasonable and should be protected under the doctrine of qualified immunity turns on the particular facts of each case. Although the facts alleged . . . do not state as clear a case of deliberate indifference to [the decedent's] mental health needs . . . neither do they unequivocally support a qualified immunity defense at this pleading stage."). Therefore, Napolitano and Jackson's Motion To Dismiss the Fourteenth Amendment Claim is denied. However, Napolitano and Jackson are free to renew their qualified immunity defense at a later date.

### b. County Defendant Villani

Villani concedes that Plaintiff has plausibly pled the objective element for purposes of the present Motion. (Cty. Defs.' Mem. 5.) Villani argues that the mens rea prong has not been satisfied because Plaintiff does not allege that Villani reviewed the Screening Guidelines, had any contact with Grimaldi, or was aware of her recent heroin use, mental health issues, or prior suicide attempt. (*Id.* at 7; Cty. Defs.' Reply Mem. 5.)

The allegations against Villani are less than clear. Plaintiff alleges on the day after Grimaldi's arrest, October 28, 2015, Villani "reviewed Grimaldi's charges and case file while completing an 'Inmate Classification Points Sheet.'" (Compl. ¶ 49.) Plaintiff does not explain what this Inmate Classification Points Sheet is, but avers that "Villani did not properly calculate" Grimaldi's classification, which resulted in "a higher classification score." (*Id.* ¶ 50.) Plaintiff suggests that proper calculation of "Grimaldi's prior misbehavior and disciplinary infractions" would have resulted in "a lower classification score and additional supervision from correction

officers." (*Id.* ¶ 51.) As Villani points out, Plaintiff does not allege that Villani had access to Grimaldi's medical records or the Screening Guidelines form while completing the Inmate Classification Points Sheet, that Villani had any direct contact with Grimaldi, or that he was aware Grimaldi had told Napolitano about her mental health issues, prior suicide attempt, or recent heroin use. (*See* Compl. ¶¶ 49–51.) Plaintiff's allegation is that Villani miscalculated Grimaldi's prior misbehavior and disciplinary infractions—an issue distinct from Grimaldi's health and her suicide risk. Based on these allegations, Plaintiff has failed to state a plausible claim that Villani was deliberately indifferent to Grimaldi's serious medical condition. Villani's calculation error, which is not explained in any detail, is at best negligent, and "any § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." *Smith*, 2017 WL 4417699, at *3 (quoting *Darnell*, 849 F.3d at 36) (italics omitted). Accordingly, Villani's Motion To Dismiss the Fourteenth Amendment claim against him is granted.

### c. County Defendant Smith

Smith argues that the Fourteenth Amendment Claim should be dismissed against him because he was not personally involved in the alleged deprivation of adequate medical. (Cty. Defs.' Mem. 10–11; Cty. Defs.' Reply Mem. 5–6.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a

policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted).  In other words, "because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Therefore, Plaintiff must plausibly allege conduct by Smith that falls into one of the five categories identified above.  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Plaintiff has failed to plausibly allege a claim against Smith for his personal involvement in the alleged Constitutional deprivations.  The gravamen of the Complaint is that Grimaldi was improperly placed on "routine" instead of "heightened" supervision, despite the fact that she informed certain PCCF staff of her mental heath issues, recent heroin use, and a previous suicide attempt during her intake interview.  Plaintiff alleges Smith "was deliberately indifferent to his subordinate's unconstitutional conduct, and his inaction is affirmatively linked to the deprivation of . . . Grimaldi's rights."  (Compl. ¶ 89.)  Thus, he is liable under the theory of "[s]upervisory [l]iability."  (*Id.*)  The Complaint contains no allegations whatsoever that Smith was involved in, aware of, or somehow permitted Grimaldi to be placed on "routine" supervision.  The Complaint does not even allege that Smith interacted with Grimaldi or any of the PCCF employees responsible for making the screening recommendation for Grimaldi during the two days Grimaldi was at incarcerated PCCF.  Unlike in *Case*, upon which Plaintiff heavily relies, there is

no allegation of "[Smith's] personal involvement and notice of [Grimaldi's] condition." *Case*, 2017 WL 3701863, at \*20 (denying motion to dismiss "given [the p]laintiff's allegations that the Sheriff was *directly involved* in transferring [the decedent] from the Town Court to the County Jail, his knowledge of [the decedent's] mental health issues, and his supervision of the County Deputies once [the decedent] was held on the warrant, [the p]laintiff plausibly alleges the Sheriff should have had enough awareness of these issues . . . that it amounts to deliberate indifference" (internal quotation marks omitted)).[8]

Smith cannot be held personally liable for constitutional violations by other Defendants merely "because he was in a high position of authority in the prison system." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (affirming summary judgement in favor of the Commissioner of the New York Department of Correctional Services); *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (explaining that "[a] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority"). "Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." *Fortunato v. Bernstein*, No. 12-CV-1630, 2015 WL 5813376, at \*6 (S.D.N.Y. Sept. 1, 2015) (internal quotation marks omitted). Personal involvement requires "a showing of more than the linkage in the prison chain of command." *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (same).

---

[8] In asserting Smith's personal involvement, Plaintiff quotes and cites to portions of *Case* relating to the County of Dutchess's liability for state negligence claims, *see Case*, 2017 WL 3701863, at \*20–29 (discussing state law claims of negligence and wrongful death). Because these quotes are not relevant to adjudication of Smith's liability under § 1983, they are not considered.

Additionally, the Amended Complaint lacks any allegation that Smith failed to intervene in the intake of Grimaldi or classification determination by failing to remedy a known wrong or "exhibit[ing] deliberate indifference" to Grimaldi's condition "by failing to act on information indicating that unconstitutional acts were occurring." *Grullon*, 720 F.3d at 139 (italics and internal quotation marks omitted). Nor does Plaintiff allege that Smith was aware that Napolitano, Jackson, or Stewart had a history of deliberate indifference to inmates' medical needs, such that the Court could reasonably infer that Smith knew Napolitano, Jackson, or Stewart's would be deliberately indifferent to Grimaldi's medical needs. *See id.* (listing as a category of personal involvement when a defendant "was grossly negligent in supervising subordinates who committed the wrongful acts").

Plaintiff does allege Smith "created a policy or custom under which unconstitutional practices occurred." *Id.* (*See* Compl. ¶¶ 95–98.) More specifically Plaintiff alleges "Smith is and was . . . responsible . . . for the creation, implementation, promulgation, and enforcement of the actions, policies, and/or customs" complained of. (*Id.* ¶ 13.) "As Sheriff . . . Smith was the final policy-making official for PCCF." (*Id.*)[9] However, Smith is shielded by qualified immunity as to that claim. In 2015, the year of Grimaldi's death, the Supreme Court held that

---

[9] The Court notes that this claim also fails because it merely alleges a legal conclusion and thus fails as a matter of law. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *See Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). "Second Circuit law has long taught that, even within the context of the *Colon* framework, merely reciting the legal elements of a successful § 1983 claim for supervisory liability does not meet the plausibility pleading standard." *Samuels v. Fischer*, 168 F. Supp. 3d 625, 636–37 (S.D.N.Y. 2016) (alteration and internal quotation marks omitted).

"[n]o decision of th[e Supreme] Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols." *Taylor*, 135 S. Ct. at 2042. "And 'to the extent that a robust consensus of cases of persuasive authority' in the Courts of Appeals 'could itself clearly establish the federal right respondent alleges,' the weight of that authority at the time of [Grimaldi's] death suggested that such a right did *not* exist." *Id.* (quoting *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1779 (2015)). Thus, "even if [Putnam County's] suicide screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books in [2015] would have made clear to [Smith] that [he was] overseeing a system that violated the Constitution. Because, at the very least, [Smith] w[as] not contravening clearly established law, [he is] entitled to qualified immunity." *Id.* at 2045. Accordingly, Smith's Motion To Dismiss the Fourteenth Amendment Claim against him is granted.

### d.  Defendant Stewart

Stewart argues Plaintiff has failed to plausibly allege that he recklessly ignored a substantial risk of suicide because there is no allegation that Stewart was aware of Grimaldi's substantial risk of suicide, and that the allegations at best only make out a claim of nursing malpractice, which is insufficient to state a claim under § 1983. (Def. Stewart's Mem. 7–12.) It is unclear if Stewart also argues Grimaldi did not suffer from a serious medical condition, but Stewart's Reply Memorandum of Law states that the Complaint fails to allege "any current manifestations or signs of an extant serious medical condition." (Def. Stewart's Reply Mem. 4.) The Court finds Plaintiff has sufficiently alleged Stewart was deliberately indifferent to Grimaldi's serious medical need.

Starting with the objective prong, the Court finds that Plaintiff has sufficiently pled that Grimaldi's prior suicide attempt, recent heroin use, and mental health conditions, including bipolar disorder, "in combination, pose[d] an unreasonable risk of serious damage to [her] health." *Walker*, 717 F.3d at 125. This is in accord with other district courts in the Second Circuit, which have held that "withdrawal, combined with [the plaintiff's] numerous psychological problems amounted to a 'sufficiently serious' medical problem." *Ryan*, 2018 WL 354684, at *5. "[T]he fact that the symptoms [s]he exhibited while in the custody of the various law enforcement agencies may have fallen short of announcing h[er] suicidal intentions does not reduce the seriousness of [the plaintiff's] medical needs." *Case*, 2017 WL 3701863, at *10.

Courts have held that drug or alcohol withdrawal alone constitutes a serious medical condition. *See, e.g.*, *Livermore v. City of New York,* No. 08-CV-4442, 2011 WL 182052, at *6 (S.D.N.Y. Jan. 13, 2011) ("[T]he Second Circuit often holds, frequently with little elaboration, that alcohol withdrawal satisfies the first element."); *see also Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (noting that "[a]lthough there is no per se rule that drug or alcohol withdrawal constitutes an objectively serious medical condition, courts in this Circuit have found many such instances to satisfy the objective prong," and finding the prong satisfied because Plaintiff pled that it was "clear that [the decedent] needed medically supervised drug detoxification because she acknowledged being under the influence of drugs, daily drug usage, and a history of drug abuse, at the time of her admission to Monroe County Jail, and that a visual assessment would have shown that she was under the influence of drugs at the time of her admission" (internal quotation marks and italics omitted)); *Mayo v. County of Albany*, 357 F. App'x. 339, 341 (2d Cir. 2009) ("To the extent that withdrawal from heroin . . . presents a

serious medical condition, it appears undisputed that [the plaintiff] satisfied the first prong of the test.").[10]

And, serious mental disorders, such as bipolar disorder, also independently qualify as sufficiently serious medical conditions. *See, e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need" (internal quotation marks omitted); *Case*, 2017 WL 3701863, at *10 ("[I]t goes without saying that [s]uicide is a serious harm, which may result from a mental disorder . . . the specific risk of self-harm to which [the decedent] was subject as a result of his bipolar disorder demonstrates the seriousness of his medical condition" (internal quotation marks omitted)); *Harvey v. Sawyer*, No. 09-CV-598, 2010 WL 3323665, at *7 (N.D.N.Y. July 22, 2010), *adopted by* 2010 WL 3323669 (N.D.N.Y. Aug. 20, 2010) (holding that an inmate "was undoubtedly suffering from a serious medical need, whether from bipolar disorder or paranoid schizophrenia").

And, "[c]ourts which have considered the issue have ruled that in the context of suicide, jailers are not required to safeguard every inmate; only those presenting a 'strong likelihood of suicide' are entitled to protection." *Burke v. Warren Cty. Sheriff's Dep't*, No. 90-CV-597, 1994 WL 675042, at *6 (N.D.N.Y. Nov. 25, 1994). "In order to establish a strong likelihood of

_____

[10] The Court notes that most of these cases involve detainees experiencing withdrawal, not detainees who may have had a propensity to suffer from withdrawal due to a history of prior drug use. *See Livermore*, 2011 WL 182052, at *3 (noting decedent was reported to be "acting erratically" and "sweat profusely, began to bang on the door of his cell, and exhibited other bizarre behavior."); *Mayo v. County of Albany*, No. 07-CV-823, 2009 WL 935804, at *4 (N.D.N.Y. Apr. 3, 2009), *aff'd*, 357 F. App'x 339 (2d Cir. 2009) (noting the plaintiff's "detoxification flow sheet revealed that . . . she was suffering from tremors, agitation and visual hallucinations").

suicide, a detainee must have made a previous threat or an earlier attempt at suicide." *Id.*; *see also Jabot v. MHU Counselor Roszel*, No. 14-CV-3951, 2016 WL 6996173, at *3 (S.D.N.Y. Nov. 29, 2016) (holding the objective prong satisfied because "[a] propensity to attempt suicide or harm oneself is indisputably a serious medical condition"); *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (same). Drawing all reasonable inferences in Plaintiff's favor, the Court finds Plaintiff has sufficiently pled Grimaldi suffered from an objectively serious medical condition.

Regarding the subjective prong, Plaintiff alleges that Stewart examined Grimaldi in the booking room following Grimaldi's intake interview with Napolitano and Jackson's review of the intake form. (Compl. ¶¶ 44–46.) Stewart allegedly "agreed with . . . Napolitano's recommendation for 'routine supervision,' despite knowing" that Grimaldi had told "Napolitano that she had previously attempted suicide, suffered mental health issues, and had recently injected heroin." (*Id.* ¶ 47.) Stewart counters that the Complaint does not allege "any current or recent mental health issues, suicide attempts, suicidal thoughts, or suicidal plan; nor that she expressed any desire to harm herself at th[e intake] interview. No symptoms of active mental illness or suicidal threats or self-harming behavior are alleged to have been present." (Symer Decl. ¶ 13.)[11] Stewart also argues that the allegations merely support a claim of nursing

---

[11] As with Napolitano and Jackson, Plaintiff does not allege that Stewart was aware of or saw the specific PCCF records indicating Grimaldi's prior opioid and mental health issues, the handwritten requests seeking medical help, or that she had previously been placed on "heightened supervision." (Compl. ¶¶ 2, 38–39, 41, 46–47). And, Plaintiff's allegations regarding Grimaldi's cries for help do not suggest that these requests were made to Stewart or that Stewart was aware of them. (*Id.* ¶¶ 53–55.) Thus, the Court does not consider these allegations in determining whether Stewart "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

malpractice or negligence, (Def. Stewart's Mem. 5–7), and that "the level of supervision assigned was sufficient," (*id.* at 9).

As with Napolitano and Jackson, here, too, the Court cannot say that Plaintiff's allegation that Stewart knew or should have known of Grimaldi's suicide risk based on the information he had and that providing Grimaldi with only routine supervision was not reasonable care, with all reasonable inferences drawn in Plaintiff's favor, fails to state a claim for deliberate indifference. Stewart's Motion To Dismiss the Fourteenth Amendment claim is denied for the same reasons explained above in regards to Napolitano and Jackson. *See, e.g.*, *Thomas v. Ashcroft,* 470 F.3d 491, 497 (2d Cir. 2006) (denying a motion to dismiss a prisoner's complaint that alleged the defendants ignored his serious medical needs despite being made aware of them); *Case*, 2017 WL 3701863, at *11 (same); *Silvera*, 726 F. Supp. 2d at 192 (same). Stewart is free to renew his arguments at a later time.

### 2. First Cause of Action – Familial Association Claim[12]

Defendants move to dismiss Plaintiff's interference with familial association claims under both the First and Fourteenth Amendments, arguing that Plaintiff has not pled that Grimaldi was retaliated against for exercise of free speech, (Cty. Defs.' Mem. 7–8; Def. Stewart's Mem. 12–13), or that Defendants' actions were intentionally directed at the familial relationships, (Cty. Defs.' Mem. 8; Def. Stewart's Mem. 13).

---

[12] Both the Fourteenth Amendment Deliberate Indifference Claim and the First Amendment Familial Association Claim are grouped into the "First Cause of Action" in the Complaint. (*See* Compl. ¶¶ 83–91.) The Court adopts the Complaint's system of numbering the causes of action.

"The source of the intimate association right has not been authoritatively determined."

*Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999); *see also Piscottano v. Murphy*, 511 F.3d 247,

278 (2d Cir. 2007) (same).  In *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), the Supreme Court

suggested that the intimate association right is "a component of the personal liberty protected by

the Due Process Clause," *Adler*, 185 F.3d at 42, while in *City of Dallas v. Stanglin*, 490 U.S. 19,

(1989), the Supreme Court discussed the right to intimate association as grounded in the First

Amendment, *see Adler*, 185 F.3d at 42 (discussing Supreme Court treatment of the right).

Indeed, courts have analyzed claims that involved retaliation for the First Amendment activities

of a family member under the First Amendment.  *See id.* at 44 ("[A] spouse's claim that adverse

action was taken solely against that spouse in retaliation for conduct of the other spouse should

be analyzed as a claimed violation of a First Amendment right of intimate association."); *see also*

*Garten v. Hochman*, No. 08–CV–9425, 2010 WL 2465479, at *3 (S.D.N.Y. June 16, 2010)

("Courts in th[e Second C]ircuit have acknowledged that a First Amendment right to intimate

association is implicated where a plaintiff is allegedly retaliated against for the First Amendment

activities of a family member."  (alteration and internal quotation mark omitted)); *Sutton v. Vill.*

*of Valley Stream of New York*, 96 F. Supp. 2d 189, 192–93 (E.D.N.Y. 2000) (holding that

plaintiff had stated a claim for violation of his First Amendment right to intimate association

where he alleged that his employer harassed him in retaliation for his father's political activities).

"Where the intimate association right at issue is tied to familial relationships and is

independent of First Amendment retaliation concerns, however, the Second Circuit has

employed an analysis under the framework of the Fourteenth Amendment right to substantive

due process."  *Garten*, 2010 WL 2465479, at *4; *see also Patel v. Searles*, 305 F.3d 130, 135 (2d

Cir. 2002) (describing the right as protected "as a fundamental element of personal liberty" and discussing it in the context "substantive due process cases" (internal quotation marks omitted)); *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103–04 (2d Cir. 1999) (discussing the right to integrity of familial relationships under the Fourteenth Amendment); *Pizzuto v. Cty. of Nassau*, 240 F. Supp. 2d 203, 208 n. 2 (E.D.N.Y. 2002) ("[B]ecause the freedom to associate guaranteed by the First Amendment protects associational interests related to speech and petition, and because those associational interests are not implicated in this case, [the court] find[s] that [the plaintiff's] claim must be examined under the Fourteenth Amendment, rather than the First Amendment."). The Court analyzes Plaintiff's claim under the Fourteenth Amendment, as Plaintiff has not alleged any retaliatory action based on Grimaldi's First Amendment activities.

Individual Defendants argue that they are entitled to qualified immunity as to Plaintiff's claim, as there are conflicting decisions regarding "whether intentional interference is necessary to state a familial association claim." *Cruz v. City of New Rochelle*, No. 13-CV-7432, 2017 WL 1402122, at *28 (S.D.N.Y. Apr. 3, 2017). The Court begins, not with an analysis of whether a constitutional right was violated, but by examining whether a reasonable law enforcement officer in Individual Defendants' position would have believed his or her conduct would violate Plaintiff's right to familial association. *See Pearson*, 555 U.S. at 236 (overruling *Saucier* and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated, but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first").

There cannot be much debate that as a general proposition, the right to familial association had been established by 2015. According to the Second Circuit, "the general right to intimate association has been clearly established since 1984 when *Roberts*[, 468 U.S. 609,] was decided." *Patel*, 305 F.3d at 139; *see also Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) ("We have long recognized that parents have a constitutionally protected liberty interest in the care, custody and management of their children, and that the deprivation of this interest is actionable on a substantive due process theory." (citations and internal quotation marks omitted)).

The more critical question here is whether, in 2015, the right was established "in a particularized sense so that the contours of the right [would have been] clear to a reasonable official." *Reichle*, 556 U.S. at 665 (internal quotation marks omitted). In *Patel*, the Second Circuit defined a core set of clearly unlawful behavior: where police "engage[d] in an extended public and private defamatory misinformation campaign to destroy a family, hoping that those tactics might produce incriminating leads in a murder investigation." 305 F.3d at 140 (italics omitted). *Patel* acknowledged the "uncertainty as to the contours of the right" to familial association, but held that this uncertainty did "not extend so far as to suggest that a murder investigation erodes all of the 'critical buffers between the individual and the power of the State.'" *Id.* at 139 (quoting *Roberts*, 468 U.S. at 619). *Patel* stated that to "[e]mbrac[e] that view would render hollow the right to intimate association." *Id.* at 140. Thus, in *Patel*, the Second Circuit held that the officers who intentionally directed their efforts at Patel and his family were not entitled to qualified immunity. *See id.*

Here, however, there is no allegation that the Individual Defendants' behavior was intentionally directed at Plaintiff's relationship with Grimaldi. Instead, Plaintiff asserts Second Circuit precedent does not require intentional interference; therefore, Plaintiff has pled facts sufficient to state a substantive due process claim due to the Officers' conscience-shocking behavior. (Pl.'s County Defs.' Mem. 12; Pl.'s Def. Stewart Mem. 15.) Because Plaintiff does not allege that Individual Defendants' behavior was intentionally directed at the familial relationship, their alleged misconduct does not fall within the category of behavior that *Patel* held violated the right to familial association. The Individual Defendants' behavior was not clearly unlawful in 2015, because no "existing precedent . . . placed the statutory or constitutional question beyond debate." *Reichle*, 556 U.S. at 665 (internal quotation marks omitted). There was no Second Circuit or Supreme Court case stating that such conduct was unlawful.[13] Other circuit courts had split on the issue.[14] For example, the Tenth Circuit held that

_____

[13] To the Court's knowledge, the only district court within the Second Circuit that had addressed whether demonstrating specific intent was necessary to make out this claim had summarily answered in the negative. *See Greene v. City of New York*, 675 F. Supp. 110, 114–15 (S.D.N.Y. 1987) (declining to impose an intent requirement in a [§] 1983 "claim for deprivation of the parent-child relationship in the wrongful death context," arguing that to require, "in addition to the intent to shoot with reckless disregard as to the consequences, a specific awareness on the defendant's part that the plaintiff had children who would be deprived of his companionship if he were killed would effectively nullify the right altogether in the wrongful death context"). However, *Greene* cited neither Supreme Court nor Second Circuit decisions clearly establishing the proposition that a state actor could be held to violate the right to familial association absent a showing of the actor's specific intent to interfere with the family's relationship.

[14] While decisions by other circuit courts are obviously not binding precedent here, the Supreme Court has instructed that a right may be clearly established even absent "controlling authority" from the Supreme Court or the governing circuit court if there is or was a "robust consensus of cases of persuasive authority" from the other circuits establishing the right. *Taylor*, 135 S. Ct. at 2044 (internal quotation marks omitted). Hence, the Second Circuit has from time to time cited case law from other circuits to show that courts generally were divided over the

an allegation of specific intent to interfere with the familial relationship is necessary to make out a constitutional claim, *see Trujillo v. Bd. of Cty. Comm'rs of the Cty. of Santa Fe*, 768 F.2d 1186, 1190 (10th Cir. 1985) ("[A]n allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim."), and the First, Seventh, and Eighth Circuits have held that intent might be required, *see Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005) (noting that in the case before the court there was no "intentional action by the state to interfere with a familial relationship"); *Harpole v. Ark. Dep't of Human Servs.*, 820 F.2d 923, 928 (8th Cir. 1987) ("Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct."); *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8–9 (1st Cir. 1986) (noting that a claim requires "governmental action directly aimed at the relationship between a parent and a young child"), while the Ninth Circuit has allowed such claims to go forward without a showing of specific intent, *see Kelson v. City of Springfield*, 767 F.2d 651, 653–655 (9th Cir. 1985).

While the Supreme Court has not addressed this specific issue, it had noted in another substantive due process case that "[h]istorically, [the] guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property.

---

lawfulness of a particular behavior, as extra support for a finding that the behavior was not clearly unlawful. *See Wilkinson*, 182 F.3d at 107 n.10 (citing case law from the Eighth Circuit to support conclusion that challenged behavior was not clearly unlawful at time); *see also Doninger*, 642 F.3d at 350 ("Finally, our conclusion that whatever right [the plaintiff] may have had was not clearly established is buttressed by the similarities between this case and the Sixth Circuit's decision in *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007), decided only shortly after the events at issue here.").

No [prior] decision . . . support[s] the view that negligent conduct by a state official, even though causing injury, constitutes a deprivation under the Due Process Clause." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (italics and citations omitted) (collecting cases).[15]  While this language could be interpreted merely to require that Individual Defendants' intentionally violated Grimaldi's rights, it could also be interpreted to mean that for Plaintiff to have a claim, Individual Defendants' must have intended to violate Plaintiff's rights, *i.e.*, that Individual Defendants' had the specific intent to interfere with Plaintiff's familial relationship with Grimaldi.  Where, as here, no decision of the Supreme Court or Second Circuit has found a violation of the right of familial association "on facts even roughly comparable to those present in this case" by 2015, and "[o]n the contrary, some [Supreme Court] opinions [could have been] read as pointing in the opposition direction," the Court cannot say that conduct not intentionally directed at the familial relationship was clearly unlawful in 2015.  *Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (granting qualified immunity).

There is no plausible allegation that Individual Defendants intentionally interfered with Plaintiff's relationship with Grimaldi (as distinguished from intentionally violating Grimaldi's rights), and anything less than conduct intentionally directed at the familial relationship was not clearly established as unlawful within the Second Circuit at the time of Individual Defendants' behavior in 2015.[16]  The Court therefore holds that Individual Defendants are entitled to

---

[15] In *Daniels*, an inmate brought a civil rights action to recover for injuries allegedly sustained when he slipped and fell on a pillow, left by a deputy sheriff, on the stairs of the jail where he was confined.  *See* 474 U.S. at 328.

[16] To the extent Plaintiff attempts to allege a claim for the unnamed PCSH officers' interference with family member's access to Grimaldi while hospitalized at PHC, (*see* Compl. ¶¶ 67–68), Plaintiff does not allege that any of the named Individual Defendants was responsible

qualified immunity on Plaintiff's familial association claim. *See Cruz*, 2017 WL 1402122, at

*28 (holding that "[b]ecause the Second Circuit has not decided whether intentional interference

with the familial relationship is necessary to make out a constitutional claim of deprivation of the

right to familial association, and other courts have been split on this issue, both in other Circuits

and within th[e Second] Circuit, the law on this issue is not clearly established, and Defendants

are therefore entitled to qualified immunity on this claim" (internal citations omitted)); *Ranta v.*

*City of New York*, No. 14-CV-3794, 2015 WL 5821658, at *5 (E.D.N.Y. Sept 30, 2015) ("[T]his

[c]ourt finds that it need not reach the question of intentional interference because [the

detectives] are entitled to qualified immunity."); *McCants v. City of Newburgh*, No. 14-CV-556,

2014 WL 6645987, at *3 (S.D.N.Y. Nov. 21, 2014) (granting qualified immunity for familial

association claim due to "the murkiness of the law regarding the level of intent necessary to find

a deprivation of the right to familial association."), *clarified on denial of reconsideration*, 2014

WL 7398910 (S.D.N.Y. Dec. 9, 2014); *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 472

(S.D.N.Y. 2012) (same).[17]

### 3. Second Cause of Action – *Monell* Claims Against Putnam County

Putnam County argues that the Complaint should be dismissed for failure to allege a

municipal policy, custom, or practice that caused the alleged constitutional violations. (Cty.

Defs.' Mem. 8–9.) "Congress did not intend municipalities to be held liable [under § 1983]

---

for that interference.

[17] The Court is not holding that Plaintiff would have to show conduct intentionally aimed
at her relationship with Grimaldi to make out a violation of her right to familial association; the
Court is holding merely that Individual Defendants are entitled to qualified immunity under the
facts taken in a light most favorable to Plaintiff.

unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability); *see also Ryan*, 2018 WL 354684, at *3 ("In order for a municipality . . . to be liable for deliberate indifference to medical needs under *Monell* . . . the plaintiff must show that the action that caused the constitutional violation was undertaken pursuant to an official policy." (internal quotation marks omitted)). Moreover, a plaintiff also must establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See City of Okla. v. Tuttle*, 471 U.S. 808, 824 n. 8 ("The fact that a

40

municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue."); *see also Simms v. City of New York*, 480 F. App'x. 627, 629 (2d Cir. 2012) ("[T]he plaintiff must 'demonstrate that, through its deliberate conduct, the municipality itself was the moving force behind the alleged injury.'" (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (alteration omitted)).

"Municipal liability may also be premised on a failure to train employees when inadequate training 'reflects deliberate indifference to . . . constitutional rights.'" *Okin v. Vill. of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Only where a plaintiff can demonstrate that a municipality's failure to train "amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" will a policy or custom actionable under § 1983 be established. *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal quotation marks omitted); *see also Connick*, 563 U.S. at 61–62 (same); *Canton*, 489 U.S. at 388 (same).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). To establish deliberate indifference, a plaintiff must demonstrate that: (1) "a policymaker knows to a moral certainty that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice

of the sort that training . . . will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (internal quotation marks omitted). "[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

"[W]here . . . a city has a training program, a plaintiff must . . . 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." *Okin*, 577 F.3d at 440–41 (quoting *Canton*, 489 U.S. at 390–91).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted). This is because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* At the same time, however, the Supreme Court in *Connick* reaffirmed the viability, in limited circumstances, of the "single-incident" theory of liability envisioned in *Canton*. *See id.* at 63–65

(holding the particular claim at issue did not fall "within the narrow range of *Canton's* hypothesized single-incident liability"); *Canton*, 489 U.S. at 390 n.10 (outlining single-incident theory of liability). Under the single-incident theory, a municipality can be found to be deliberately indifferent based on a single constitutional violation where "the unconstitutional consequences of failing to train [are] so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. Violation of constitutional rights must be a "highly predictable consequence" of the failure to train. *Id.* (internal quotation marks omitted). "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (internal citations, quotation marks, and alterations omitted).

Of the four categories among which a *Monell* plaintiff must establish, Plaintiff's allegations implicate the first and fourth categories—a formal policy regarding inmate screening and the provision of suicide-prevention services, (*see* Compl. ¶ 94), and a failure to train officers to identify and address serious medical conditions, (*see id.* ¶ 95–96). The Complaint fails to allege a *Monell* claim against Putnam County under either category.

Plaintiff has failed to plausibly allege an official policy or custom that caused Plaintiff to be subjected to a denial of Grimaldi's constitutional right to be free from deliberate indifference to her medical needs. (Compl. ¶ 94.) There are at least two circumstances that courts have expressly identified as constituting a municipal policy: "where there is an officially promulgated policy as that term is generally understood," and "where a single act is taken by a municipal

employee who, as a matter of [s]tate law, has final policymaking authority in the area in which the action was taken." *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008).

The Complaint alleges that Westchester County:

> maintained a policy or de facto unconstitutional custom or practice of permitting, ignoring, and condoning: (1) failure of PCCF personnel to provide adequate mental health services and medical assistance for the protection of the health or safety of incarcerated people; (2) failure to properly observe and treat incarcerated people, including inadequate intake, screening, evaluation, diagnosis, referral to mental health professionals, treatment plans, administration of medications, medical record keeping, staffing, communication between medical, mental health, and custodial staff, housing, supervision, and access to mental and medical health care; and (3) failure to supervise, failure to report, and failure to investigate.

(Compl. ¶ 94.) Additionally, Plaintiff alleges Westchester County "maintained a policy, custom, or practice of failing to provide adequate staff, supervision, training, or recordkeeping in the PCCF causing a failure to properly monitor incarcerated people." (*Id.* ¶ 95.) However, Plaintiff fails to cite or describe a policy officially promulgated by Westchester County or a specific act taken by a final policymaker of Westchester County regarding inmate suicide prevention.[18] "Conclusory allegations that there was such a policy or custom, without identifying or alleging supporting facts, is insufficient to state a claim." *Maynard v. City of New York,* No. 13-CV-3412, 2013 WL 6667681, at *4 (S.D.N.Y. Dec. 17, 2013); *see also Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991) (reaffirming "that an allegation of municipal policy or

---

[18] Plaintiff reframes the *Monell* argument in the Opposition as an allegation that Screening Guidelines developed by New York State are deficient, and that other municipalities have adopted more robust procedures to prevent inmate suicide, but Putman County failed to do so. (Pl.'s Mem. 15.) Plaintiff argues that based on the Screening Guidelines, Grimaldi was not appropriately supervised for her serious medical conditions and instead received "the same supervisions and treatment as someone who suffered from none of these afflictions." (*Id.*) However, these claims were not alleged in the Complaint. Plaintiff is free to raise them in an Amended Complaint.

custom would be insufficient if wholly conclusory"); *Guerrero v. City of New York*, No. 12-CV-2916, 2013 WL 673872, at *2 (S.D.N.Y. Feb. 25, 2013) ("At the pleading stage, the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." (internal quotation marks omitted)); *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009) (dismissing a *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [c]ity policy—unspoken or otherwise—that violates the Federal Constitution"); *cf. Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (holding that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

Plaintiff has also failed to sufficiently allege that Putnam County was "deliberately indifferent" because it "disregarded a known or obvious consequence" of failing to train PCCF employees to identify and address serious medical conditions that may lead to suicide. *Brown*, 520 U.S. at 410. More specifically, Plaintiff's failure to train claim does not allege any of the three requirements outlined in *Walker*, 974 F.2d 293, and the Court cannot simply infer the requirements have been met. *See Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) ("[The p]laintiff need not prove these elements, but still must plead them sufficiently to make out a plausible claim for relief."). Plaintiff does not allege any County policy maker knew "to a moral certainty that her employees will confront a given situation," that "the situation either presents the employee with a difficult choice of the sort that training . . . will make less difficult or that there is a history of employees mishandling the

situation," or that the "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker*, 974 F.2d at 297–98 (internal quotation marks omitted). The Complaint also fails to "identify a specific deficiency in [Putnam County's] training program," *Wray*, 490 F.3d at 196 (internal quotation marks omitted),—there is no discussion of how, specifically, Putnam County's training program for correction officers conducting intake interviews was deficient. *See Tieman*, 2015 WL 1379652, at *22 ("To allege a failure to train claim, a plaintiff must plausibly allege a specific deficiency in the municipality's training."). Without establishing a specific deficiency, the Complaint also fails to "establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Wray*, 490 F.3d at 196 (quoting *Amnesty Am.*, 361 F.3d at 129). Plaintiff's assertion that another detainee attempted suicide four days after Grimaldi, (Comp. ¶ 78–79), hardly demonstrates "a pattern of similar constitutional violations," *Connick*, 563 U.S. at 62, as there is no allegation the detainee experienced the same suicide risk as Grimaldi, that Putnam County was made aware of such risk, or what level of supervision that detainee received. Accordingly, Plaintiff's "mere allegations of . . . inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom" because they are not "supported by factual details." *Tieman*, 2015 WL 1379652, at *13; *see also Calderon v. City of New York*, 138 F. Supp. 3d 593, 614 (S.D.N.Y. 2015) (dismissing *Monell* claim where the complaint "makes only conclusory and highly general allegations about the [c]ity's training programs" and "[n]o specific deficiencies, . . . [we]re pled, including with regard to the practice at issue here"), *on reconsideration in part*, 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015); *Simms v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *2 n. 3 (S.D.N.Y. Sept. 28, 2011) ("Since [*Iqbal*

and *Twombly*], courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train.") (collecting cases), *aff'd sub nom. Simms*, 480 F. App'x 627); *see also Simms*, 480 F. App'x. at 631 n. 4 ("While it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery . . . this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim." (citation omitted)); *Santos v. New York City*, 847 F. Supp. 2d 573, 577 (S.D.N.Y. 2012) ("Because the existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff, [the plaintiff's] claims against the [c]ity are dismissed." (citation omitted)).

For these reasons, County Defendant's Motion is denied as to the *Monell* claims regarding Putnam County's policy for providing services to detainees with serious medical conditions. However, the *Monell* claim alleging Putnam County's to failure to train its employees is dismissed.

### 4.  Third Cause of Action – Americans with Disabilities Act and Rehabilitation Act Claims

Putnam County argues Plaintiff's ADA and Rehabilitation Act claims should be dismissed, because Grimaldi was not a "qualified individual" under the ADA due to her illegal drug use and because Plaintiff was not excluded from participating in a program or activity or otherwise treated differently because of any disability.  (Cty. Defs.' Mem. 9–10.)

Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity."  42 U.S.C. § 12132.  The Supreme Court has held that Title II

extends to inmates in state prisons.  *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213

(1998).  Similarly, § 504 of the Rehabilitation Act, which also has been held to apply to state

prisoners, *see*, *e.g.*, *Keitt v. New York City*, 882 F. Supp. 2d 412, 425 (S.D.N.Y. 2011), protects a

"qualified individual with a disability" from exclusion of participation, denial of benefits, or

subjection to discrimination based on the individual's disability "under any program or activity

receiving Federal financial assistance."  29 U.S.C. § 794(a).[19]

      The Second Circuit has held that an ADA claim for *damages* against a state (or state

agency or official) is not barred by the Eleventh Amendment only "if the plaintiff can establish

that the Title II violation was motivated by either discriminatory animus or ill will due to

disability."  *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir. 2001);

*accord Johnson v. Goord*, No. 01-CV-9587, 2004 WL 2199500, at *19 (S.D.N.Y. Sept. 29,

2004) (dismissing official capacity claims "under [§] 504 of the Rehabilitation Act and Title II of

the ADA . . . because those laws do not provide for money damages against the state or state

officials in their official capacities, absent a showing that any violation was motivated by

discriminatory animus or ill will due to the disability" (citing, inter alia, *Garcia*, 280 F.3d at 108,

111–12)).  Here, the Complaint is devoid of any allegation that Putnam County acted with

discriminatory animus or ill will towards Grimaldi.  (*See generally* Compl. ¶¶ 99–107.)  Rather,

---

[19] Because the ADA and Rehabilitation Act "impose identical requirements," *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999), courts analyze such claims together, *see, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *Andino v. Fischer*, 698 F. Supp. 2d 362, 378 (S.D.N.Y. 2010) (same); *see also Hilton v. Wright*, 928 F. Supp. 2d 530, 557 (N.D.N.Y. 2013) ("When brought together, claims under Title II and [§] 504 may be treated identically." (citing *Henrietta*, 331 F.3d at 272)).

as Defendants explain, Plaintiff merely contends that Grimaldi was not property treated for her physical and mental health issues and addiction, not that she was mistreated *because* of them. Nowhere does Plaintiff allege that any denial of care was rooted in discriminatory animus. Thus, Plaintiff's ADA and Rehabilitation Act claims for monetary damages against Putnam County must be dismissed in light of the absence of allegations of discriminatory animus or ill will. *See Chambers v. Wright*, No. 05-CV-9915, 2007 WL 4462181, at *4 (S.D.N.Y. Dec. 19, 2007) (dismissing ADA and Rehabilitation Act claims where the "[p]laintiff d[id] not make any allegations concerning [the] [d]efendants' discriminatory animus or ill will"); *Renelique v. Goord*, No. 03-CV-525, 2006 WL 2265399, at *11 (N.D.N.Y. Aug. 7, 2006) (dismissing official capacity claims under the ADA where the plaintiff did "not allege[] any facts that would support a conclusion that [the] [d]efendants acted with discriminatory animus or ill will toward him").

### 6.  Fifth Cause of Action – State Constitutional Claims Against Individual Defendants

Defendants argue the New York State constitutional claim should be dismissed, because Article 1 § 12 of the New York State Constitution deals with unreasonable searches and seizures and Plaintiff has not raised any allegations regarding a search or seizure of Grimaldi.  (Cty. Defs.' Mem. 13; Def. Stewart's Mem. 14.)  Defendants are correct, and the Court grants Stewart's Motion and County Defendants' Motion to dismiss the New York State constitutional claim.

Plaintiff seeks leave to amend her Complaint to include a New York State Constitution Due Process claim under Article 1 § 6 against Defendants, (Pl.'s Cty. Defs.' Mem. 15; Pl.'s Stewart Mem. 15), which the Court grants.

### 7. Sixth Cause of Action – Negligence Claims Against Individual Defendants[20]

Under New York law, which governs Plaintiff's negligence claims, "[t]o establish a prima facie case of negligence, a plaintiff must establish the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such breach was a proximate cause of injury to the plaintiff." *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 205 (E.D.N.Y. 2014) (quoting *Nappi v. Inc. Vill. of Lynbrook*, 796 N.Y.S.2d 537, 537 (App. Div. 2005)). Although "a duty of care is owed by prison authorities with respect to the health and safety of their charges," *Gordon v. City of New York*, 517 N.E.2d 1331, 1332 (N.Y. 1987), "the State's duty to prisoners does not mandate unremitting surveillance in all circumstances, and does not render the State an insurer of inmate safety," *Sanchez v. State of New York*, 784 N.E.2d 675, 681 (N.Y. 2002). "[T]he scope of the State's duty to protect inmates is limited," as in all negligence actions, "to risks of harm that are reasonably foreseeable." *Id.* at 678. Yet "foreseeability is defined not simply by actual notice but by actual or constructive notice[.]" *Id.* (italics omitted). The Court thus must return to the question of whether Defendants "fail[ed] to take reasonable steps to prevent a reasonably foreseeable suicide" while having "actual physical custody" of Grimaldi. *Cygan v. City of New York*, 566 N.Y.S.2d 232, 238 (App. Div. 1991).

Because the Court has already determined that the allegations plausibly support an inference that Napoitano, Jackson, and Stewart were reckless—or deliberately indifferent—with regard to Grimaldi's mental health needs, Plaintiff has sufficiently alleged they were potentially

---

[20] Because negligence is an element of a wrongful death claim, which Plaintiff pleads as the fourth cause of action, the Court addresses the negligence claim first. *See, e.g.*, *Case*, 2017 WL 3701863, at *20 ("[I]f [the plaintiff] . . . pleads a plausible negligence claim, then she may also assert a claim for wrongful death so long as she has suffered a pecuniary loss as a result of his passing").

negligent, or grossly negligent, in their intake of Grimaldi.  *Case*, 2017 WL 3701863, at *24

(applying same standard for state negligence claims as for federal civil rights claims).  Plaintiff

has thus sufficiently pled that Napolitano, Jackson, and Stewart breached their respective duties

to provide Grimaldi with reasonable care to ensure she did not physically harm herself.  As to

Villani, Plaintiff has not alleged that suicide is "a reasonably foreseeable consequence of" Villani

incorrectly filling out the Points Sheet.  *Cygan*, 566 N.Y.S.2d at 238 (limiting liability to "only to

those foreseeable consequences that the Department's alleged negligence was a substantial factor

in producing").  Plaintiff's allegation is that Villani miscalculated Grimaldi's prior misbehavior

and disciplinary infractions—an issue distinct from Grimaldi's health and her suicide risk.  As to

Smith, Plaintiff has failed to allege he breached of duty to Grimaldi, as Plaintiff makes no factual

allegations regarding Smith's personal involvement in Grimaldi's unfortunate death.  Thus, the

Court finds Plaintiff has not sufficiently alleged a negligence claim as to Smith.

Stewart argues the negligence claim should be dismissed as to him because Plaintiff has

not attached a Certificate of Merit for the medical malpractice claim.  (Def. Stewart's Mem. 14–

15.)  *See* N.Y. C.P.L.R. § 3012-a (requiring a Certificate of Merit for claims of medical

malpractice).  Plaintiff argues the Certificate of Merit is unnecessary because the claim against

Stewart is for ordinary negligence, and not medical malpractice.  (Pl.'s Stewart Mem. 17.)  A

claim is one for medical malpractice "only when the acts or omissions complained of involve a

matter of medical science or art requiring special skills not ordinarily possessed by lay persons."

*LaMarca v. United States*, 31 F. Supp. 2d 110, 121 (E.D.N.Y. 1998) (internal quotation marks

omitted).  New York courts have found that a "claim sounded in malpractice when it alleged that

the patient's medical condition was improperly assessed by the hospital staff."  *Id.*  Here,

Plaintiff alleges Stewart improperly assessed Grimaldi's mental health condition, possible heroin withdrawal side effects, and suicide risk. Because these determinations are a "matter of medical science . . . requiring special skills not ordinarily possessed by lay persons," this action involves medical malpractice. *Id.* (internal quotation mark omitted). Therefore, Plaintiff was required to serve a certificate of merit pursuant. However, "the proper sanction at this stage is not dismissal but a direction that the plaintiff serve a certificate of merit." *Rice v. Vandenebossche*, 586 N.Y.S.2d 303, 305 (N.Y. App. Div. 1992). Thus, Plaintiff is ordered serve a Certificate of Merit as to the claims against Stewart.

Accordingly, County Defendants' Motion To Dismiss the negligence claim is granted as to Villani and Smith and denied as to Napolitano and Jackson. Stewart's Motion To Dismiss the negligence claim is denied, but if Plaintiff fails serve a Certificate of Merit as to Stewart, the negligence claim may be dismissed.

### 8.  Fourth Cause of Action – Wrongful Death Claim Against Individual Defendants

Defendants argue the negligence element of the wrongful death claim has not been met. (Cty. Def.'s Mem. 14.) In addition to an actionable negligence claim, a claim seeking recovery for wrongful death as a result of such negligence also requires "the death of a human being," "the survival of distributees who suffered pecuniary loss by reason of the death of decedent," and "the appointment of a personal representative of the decedent." *Chong v. New York City Transit Auth.*, 441 N.Y.S.2d 24, 25–26 (App. Div. 1981).[21] "[T]he essence of the cause of action for

---

[21] The Complaint states the Fourth Cause of Action for Wrongful Death is brought against Westchester County and Individual Defendants. (Compl. 18.) However, the Sixth Cause of Action for Negligence is only brought against Individual Defendants. (Compl. 16.) Because Plaintiff has not alleged a negligence claim against Westchester County, the wrongful death

wrongful death in [New York] is that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death." *Gonzalez v. New York City Hous. Auth.*, 572 N.E.2d 598, 601 (N.Y. 1991). Because the Court has found that Plaintiff has adequately pled a negligence claim as to Napolitano, Jackson, and Stewart, *see infra* Part II.B.7, the Court also finds that Plaintiff has adequately pled a wrongful death claim as to Napolitano, Jackson, and Stewart. Because the Court has found that Plaintiff failed to adequately pled a negligence claim as to Villani and Smith, *see infra* Part II.B.7, the wrongful death claim also must fail.

Stewart argues the wrongful death claim should be dismissed as to him because Plaintiff has not attached a Certificate of Merit for the medical malpractice claim. (Def. Stewart's Mem. 14–15.) Because the claim is for medical malpractice, *see infra* Part II.B.7, Plaintiff was required to serve a Certificate of Merit pursuant to CPLR § 3012–a. Thus, Plaintiff is ordered serve a Certificate of Merit as to the wrongful death claim against Stewart.

Accordingly, County Defendants' Motion To Dismiss the wrongful death claim is granted as to Villani and Smith and denied as to Napolitano and Jackson. Stewart's Motion To Dismiss the wrongful death claim is denied, but if Plaintiff fails serve a Certificate of Merit as to Stewart, the wrongful death claim may be dismissed.

---

claim necessarily fails. *Case*, 2017 WL 3701863, at *20 ("[I]f [the plaintiff] . . . pleads a plausible negligence claim, then she may also assert a claim for wrongful death so long as she has suffered a pecuniary loss as a result of his passing.").

### 9. Seventh Cause of Action – Negligent Hiring, Training, and Supervision Under State Law Against Putnam County and the Eighth Cause of Action – Respondeat Superior Against Putnam County

Putnam County argues that because it is liable for any damages caused by Individual Defendants acting within the scope of their employment under the theory of respondeat superior, no claim may proceed against Putnam County for negligent hiring, training, or retention. (County Defs.' Mem. 14.) Plaintiff does not dispute this. "[W]here an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee's negligence under a theory of respondeat superior, no claim may proceed against the employer for negligent hiring or retention." *Karoon v. New York City Transit Auth.*, 659 N.Y.S.2d 27, 29 (App. Div. 1997) (citing *Eifert v. Bush*, 279 N.Y.S.2d 368, 370 (App. Div. 1967), *aff'd.* 238 N.E.2d 759 (N.Y. 1968)). "This is because if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay the judgment regardless of the reasonableness of the hiring or retention or the adequacy of the training." *Id.* Accordingly, County Defendant's Motion To Dismiss the negligent hiring, training, and supervision against Putnam County is granted.

### III. Conclusion

For the foregoing reasons, Stewart's Motion To Dismiss the Complaint is granted as to the first claim for violation of Plaintiff's First Amendment rights and fifth claim for violation of Article I § 12 of the New York State Constitution. Plaintiff is ordered to file a Certificate of Merit as to the fourth claim for state law wrongful death and the sixth claim for state law negligence. Stewart's Motion To Dismiss the Complaint is denied as to the other claims against Stewart.

As to Napolitano and Jackson, the Motion To Dismiss the Complaint is granted as to the first claim for violation of Plaintiff's First Amendment rights and fifth claim for violation of Article I § 12 of the New York State Constitution. County Defendants' Motion To Dismiss the Complaint is denied as to the other claims against Napolitano and Jackson.

As to Villani and Smith, the Motion To Dismiss the Complaint is granted as to the first claim for violation of Plaintiff's First, Eighth, and Fourteenth Amendment rights, fourth claim for state law wrongful death, fifth claim for violation of Article I § 12 of the New York State Constitution, and sixth claim for state law negligence. Plaintiff alleges no other claims against Villani and Smith.

As to Putnam County, the Motion To Dismiss the Complaint is granted as to the *Monell* violations, the third claim for violations of the ADA and Rehabilitation Act, the fourth claim for state law wrongful death, and the seventh claim for state law negligent hiring, training and supervision. County Defendants' Motion To Dismiss the Complaint is denied as to the other claims against Putnam County.

However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissals are without prejudice. Should Plaintiff choose to file an Amended Complaint, she must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The Amended Complaint will replace, not supplement, the complaint currently before the Court.

The Clerk of the Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 31, 34.)

SO ORDERED.

DATED:      March 29, 2018
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE