UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NANCY LARA-GRIMALDI, individually and as
Administratrix of the Estate of Alexandra Grimaldi,

Plaintiff,

-v-

COUNTY OF PUTNAM, *et al.*,

Defendants.

No. 17-CV-622 (KMK)

OPINION & ORDER

Appearances:

David Bruce Rankin, Esq.
Keith Michael Szczepanski, Esq.
Beldock Levine & Hoffman LLP
New York, NY
*Counsel for Plaintiff*

James A. Randazzo, Esq.
Portale Randazzo LLP
White Plains, NY
*Counsel for County Defendants*

Drew William Sumner, Esq.
Sumner Law LLP
White Plains, NY
*Counsel for County Defendants*

Caroline Beth Lineen, Esq.
Lewis R. Silverman, Esq.
Silverman and Associates
White Plains, NY
*Counsel for Michelle Nigro*

KENNETH M. KARAS, District Judge:

Plaintiff Nancy Lara-Grimaldi ("Plaintiff"), individually and as Administratrix of the

Estate of Alexandra Grimaldi ("Grimaldi"), brings the instant Action against Putnam County

Sergeant Karen Jackson ("Jackson"), Sergeant William Spinelli ("Spinelli"), Correction Officer

Steven Napolitano ("Napolitano"), Correction Officer Jennifer Wilkinson ("Wilkinson"),

Correction Officer Keith Puhekker ("Puhekker"), Correction Officer Michelle Nigro ("Nigro"),

Correction Officer John Cassidy ("Cassidy"), John and/or Jane Doe Officers, and John and/or

Jane Doe Medical Officials ("Does"; collectively, "Individual Defendants"), and the County of

Putnam ("Putnam County"; together with all Individual Defendants except Nigro, the "County

Defendants"), for the wrongful death of Grimaldi due to her attempted suicide while in pretrial

detention at the Putnam County Correctional Facility ("PCCF").  (*See generally* Second Am.

Compl. ("SAC") (Dkt. No. 74).)[1]  Plaintiff maintains six claims: (1) a federal claim under 42

U.S.C. § 1983 against the Individual Defendants for deliberate indifference to Plaintiff's

Fourteenth Amendment rights; (2) a federal claim under 42 U.S.C. § 1983 against Putnam

County for *Monell* violations; (3) a state law wrongful death claim against Putnam County and

the Individual Defendants; (4) a state constitutional law claim under Article I § 6 against Putnam

County and the Individual Defendants; (5) a state law negligence claim against Putnam County

and the Individual Defendants; and (6) a state law respondeat superior claim against Putnam

County.  (*See generally id*.)  Before the Court is Nigro's Motion For Summary Judgment (the

"Nigro Motion"), (*see* Not. of Mot. for Summ. J. ("Not. of Nigro Mot.") (Dkt. No. 125)), and the

County Defendants' Motion For Summary Judgment (the "Motion"), (*see* Not. of Mot. (Dkt. No.

129)).  For the reasons that follow, the Motions are granted in part and deferred in part.

---

[1] Plaintiff's SAC names Putnam County Sheriff Donald Smith ("Smith"), Officer Angela McGoorty ("McGoorty"), Correction Officer Richard Greagor ("Greagor"), Correction Officer Anthony Colello ("Colello"), and Correction Officer Trudy Giampaolo ("Giampaolo"), but the Court has dismissed Plaintiff's claim against them.  (*See* Op. & Order ("2019 Op.") (Dkt. No. 111).)  The SAC also names Christopher Stewart, but he died in January 2019, and on September 6, 2019 was dismissed from this Action.  (Dkt. No. 113.)

I.  Background[2]

A.  Factual Background

The following facts are taken from Defendants' statements pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement ("Defs.' Statement") (Dkt. No. 132); Local Civil Rule 56.1 Statement of Material Facts ("Nigro Statement") (Dkt. No. 127)), Plaintiff's Second Amended Complaint, (SAC), and admissible evidence submitted by the Parties.  Unless otherwise noted, these facts are uncontested.

1.  October 27, 2015

On October 27, 2015, Grimaldi was arrested for two drug-related misdemeanors, including criminal possession of a hypodermic needle.  (Defs.' Statement ¶ 21; Nigro Statement ¶¶ 7, 9; Pl.'s Resp. to County Defs.' Local Rule 56.1 Statement ("Pl.'s Statement") 4–5, 19 (Dkt. No. 137); SAC ¶¶ 30–34; Decl. in Supp. of Mot. ("Silverman Decl.") Ex. C ("Police Records") 809 (Dkt. No. 126-3).)[3]  She also had seven empty heroin bags.  (Police Records 809.)  Grimaldi was arrested after visiting her father, who observed that nothing seemed out of the ordinary, she was not in physical distress apart from a knee injury, and she was "fine."  (Nigro Statement ¶¶ 2–3; Pl.'s Statement 18; Silverman Decl. Ex. M ("F. Grimaldi Dep.") 15–17 (Dkt. No. 130-24).)

After being arraigned, Grimaldi was remanded and transported to PCCF.  (Defs.' Statement ¶¶ 22–23; Nigro Statement ¶¶ 10, 12–14; Pl.'s Statement 5, 19–20; SAC ¶ 34; Decl. of James A. Randazzo ("Randazzo Decl.") Ex. K ("Napolitano Dep.") 28–29 (Dkt. No. 130-11); Police Records 805, 811.)  Grimaldi had been incarcerated at PCCF several times prior to her

---

[2] The Court refers to Napolitano, Jackson, Nigro, and, where appropriate, Putnam County as "Defendants."

[3] Because Plaintiff combines her response to the County Defendants' and Nigro's Rule 56.1 Statements into a single filing, the Court refers to the page number of Plaintiff's Statement.

arrest.  (*See generally* Randazzo Decl. Ex. G ("Prior Screenings") (Dkt. No. 130-7).)  Several

staff remembered Grimaldi.  For example, Colello testified that he knew Grimaldi to be a heroin

user with depression and bipolar disorder who had previously attempted suicide.  (Randazzo

Decl. Ex. P ("Colello Dep.") 42 (Dkt. No. 130-16).)  This knowledge came from once booking

Grimaldi.  (*Id.* at 41.)  However, Colello testified to "many interactions with [Grimaldi],"

because "it's a small jail."  (*Id.* at 43.)  Based on this knowledge, Colello would have expected

Grimaldi to report that she expected to experience withdrawal symptoms.  (*Id.* at 49.)  Wilkinson

testified that she understood Grimaldi to have drug addiction issues.  (Randazzo Decl. Ex. M

("Wilkinson Dep.") 45 (Dkt. No. 130-13).)  Giampaolo testified that she knew Grimaldi to be

"bipolar" and "a drug user," and stated that she would want to make sure to watch for signs of

detoxification.  (Randazzo Decl. Ex. T ("Giampaolo Dep.") 47, 48 (Dkt. No. 130-20).)

Napolitano, who was working as the booking officer, rejected Grimaldi from intake

because of a two-day old laceration on her knee.  (Defs.' Statement ¶¶ 24, 27; Nigro Statement

¶¶ 15–17, 19; Pl.'s Statement 5, 20, 21; Napolitano Dep. 28–29.)  Napolitano had worked at

PCCF since 2008, and he knew Grimaldi from her prior incarcerations at PCCF.  (Defs.'

Statement ¶¶ 25–26; Pl.'s Statement 5; Napolitano Dep. 9, 25.)  A reasonable jury could find that

Napolitano knew that Grimaldi's prior incarcerations were related to drug possession.

(Napolitano Dep. 26.)  PCCF nurse Ibellis Diaz ("Diaz") examined Grimaldi's knee and

determined that she needed further medical attention before being admitted to PCCF.  (Defs.'

Statement ¶¶ 28–29; Nigro Statement ¶ 18; Pl.'s Statement 5–6, 20; Napolitano Dep. 29;

Randazzo Decl. Ex. L ("Diaz Dep.") 12–13 (Dkt. No. 130-12).)

Grimaldi was taken to Putnam Hospital Center ("PHC") for treatment.  (Defs.' Statement

¶ 30; Nigro Statement ¶ 20; Pl.'s Statement 6, 21; Diaz Dep. 13; Napolitano Dep. 29.)  There are

no records of Grimaldi complaining of withdrawal or expressing suicidal ideation while at PHC. (Nigro Statement ¶¶ 21–22; Pl.'s Statement 21; *see generally* Silverman Decl. Ex. D ("PHC Records") (Dkt. No. 126-4).).  Safety and psychosocial assessments noted that Grimaldi expressed no domestic concerns or suicidal thoughts, and did not wish to be dead.  (Nigro Statement ¶¶ 25, 27; Pl.'s Statement 22; PHC Records 11, 45.)  After receiving treatment for her knee, Grimaldi was returned to PCCF, arriving at approximately 7:45 P.M.  (Defs.' Statement ¶ 31; Nigro Statement ¶¶ 30–31; Pl.'s Statement 6, 22; Napolitano Dep. 29; SAC ¶¶ 35–36; Police Records 805, 811.)

Upon her arrival at PCCF, Wilkinson, who knew Grimaldi from her prior incarcerations, patted her down.  (Defs.' Statement ¶¶ 34–35; Nigro Statement ¶ 32; Pl.'s Statement 6–7, 23; Wilkinson Dep. 39, 41.)  Grimaldi told Wilkinson that she had a gash in her leg, was homeless, and was living in the woods.  (Defs.' Statement ¶ 36; Nigro Statement ¶ 34; Pl.'s Statement 7, 23; Wilkinson Dep. 43.)  Wilkinson thought that Grimaldi seemed "more alert" than she had when previously incarcerated, when she had been "detoxing" and "more drowsy."  (Nigro Statement ¶ 40; Pl.'s Statement 24; Wilkinson Dep. 44–45.)  Wilkinson did not observe anything that caused her to be concerned for Grimaldi's personal safety.  (Defs.' Statement ¶ 39; Nigro Statement ¶ 38; Pl.'s Statement 7, 23; Wilkinson Dep. 44.)

At approximately 10:22 P.M. Napolitano completed the State of New York Commission of Correction Office of Mental Health Suicide Prevention Screening Guidelines – Form 330 ADM (the "Screening Guidelines") with Grimaldi.  (Defs.' Statement ¶ 41; Nigro Statement ¶¶ 46–48; Pl.'s Statement 7, 24–25; Napolitano Dep. 30, 41; Randazzo Decl. Ex. H ("2015

Screening") (Dkt. No. 130-8).)[4]  Grimaldi revealed to Napolitano that she had used two bundles

of heroin the previous day, was bipolar, and had attempted suicide four years prior.  (Defs.'

Statement ¶ 42; Nigro Statement ¶¶ 50–51; Pl.'s Statement 8, 25; Napolitano Dep. 30–31; 2015

Screening.)  Napolitano had prior knowledge of Grimaldi's suicide attempt based on a prior

screening.  (Napolitano Dep. 27.)  Napolitano testified that he understood two bundles of

heroin—twenty bags—to be a "significant amount."  (*Id.* at 30.)  As a result of her responses to

the Screening Guidelines, Grimaldi received a score of three, which did not mandate that

Napolitano recommend constant supervision.  (Nigro Statement ¶ 53; Pl.'s Statement 26;

Napolitano Dep. 33–34; Guidelines.)

Napolitano also testified that Grimaldi did not report that she expected withdrawal

symptoms.  (Nigro Statement ¶ 52; Napolitano Dep. 31.)  Plaintiff does not identify specific

evidence to dispute this claim, but argues that it is self-serving and refuted by circumstantial

evidence.  (Pl.'s Statement 25–26.)  *See O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37

(2d Cir. 2003) (finding that, where "the witness most likely to contradict the [corrections]

officer's story—the person [who is] dead—is unable to testify, the [C]ourt may not simply

accept what may be a self-serving account by the [corrections] officer," and must consider

---

[4] The Screening Guidelines consist of a series of observations and questions.  (Defs.'
Statement ¶ 6; Pl.'s Statement 2; Randazzo Decl. Ex. F ("Guidelines") (Dkt. No. 130-6).)  Each
observation or question requires a "Yes" or "No" response, plus a written comment for each
"Yes" response.  (Defs.' Statement ¶ 7; Pl.'s Statement 2; Guidelines.)  If eight or more "Yes"
values are selected, or if any one of seven shaded "Yes" boxes is checked, constant supervision
is required.  (Defs.' Statement ¶ 8; Pl.'s Statement 2; Guidelines.)  Regardless of the number of
checks, the correction officer must institute constant supervision if he or she feels it is necessary.
(Defs.' Statement ¶ 9; Pl.'s Statement 2–3; Guidelines; Randazzo Decl. Ex. J ("Smith Dep.") 38–
39 (Dkt. No. 130-10).)
    Corrections staff receive annual suicide prevention training, including on the use of the
Screening Guidelines.  (Defs.' Statement ¶¶ 3–4; Pl.'s Statement 1–2; Napolitano Dep. 13;
Randazzo Decl. Ex. O ("Puhekker Dep.") 16–17 (Dkt. No. 130-15); Randazzo Decl. Ex. R
("Spinelli Dep.") 21–22 (Dkt. No. 130-18).)

"circumstantial evidence that, if believed, would tend to discredit the [corrections] officer's story, and consider whether this evidence could convince a rational factfinder" (citation and alterations omitted).[5]  Indeed, circumstantial evidence may call into question Napolitano's testimony.  First, Grimaldi reported to Stewart, the intake nurse, that she expected withdrawal symptoms the following day.  (*See* Randazzo Decl. Ex. I ("Stewart Notes") (Dkt. No. 130-9).)  Second, Stewart placed Grimaldi on the Clinical Opiate Withdrawal Scale ("COWS") protocol, (Nigro Statement ¶ 69; Pl.'s Statement 28; Diaz Dep. 14), which a reasonable jury could find suggested that withdrawal was expected.  Third, Grimaldi's classification document states "[d]etox" in her medical profile upon admission.  (Decl. of David B. Rankin ("Rankin Decl.") Ex. 16 ("2015 Intake") 523 (Dkt. No. 136-16).)  In light of this circumstantial evidence, a reasonable jury could find that Grimaldi reported to Napolitano that she expected withdrawal symptoms, notwithstanding Napolitano's testimony.

---

[5] Local Rule 56.1 requires that, in answering a motion for summary judgment, litigants must respond to each purportedly undisputed fact asserted by the movant.  *See* Local Rule 56.1(b).  If the answering party disputes any such fact, this "must be followed by citation to evidence which would be admissible."  *Id*. at 56.1(d).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  Plaintiff consistently violates Rule 56.1 by disputing Defendants' assertions without citing admissible evidence.  (*See* Pl.'s Statement 6, 8–11, 13, 24–27, 30–34.)  In many of these instances, Plaintiff asserts that circumstantial evidence refutes testimony that is allegedly self-serving.  (*See id*. at 6, 8, 11, 24–26, 30, 32–34.)  *See O'Bert*, 331 F.3d at 37.  The Court "is not required to consider what the parties fail to point out in their Local Rule 56.1 statements."  *Holtz*, 258 F.3d at 73 (quotation marks omitted).  Nonetheless, the Court has reviewed the record, aided by the balance of Plaintiff's submission, to ensure Plaintiff's claims receive thorough and just consideration.  *See Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012).  Where the Court finds no evidence on the record to contradict an assertion that Plaintiff without referencing admissible evidence purports to dispute, the Court deems that assertion undisputed.  *Id*.  The Court has also reviewed the record to ensure that it supports Defendants' assertions.  *See Holtz*, 258 F.3d at 74 ("Where . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").

Napolitano also testified that Grimaldi reported "not using [heroin] consistently," and that this "lowers [the] significance" of the amount of heroin Grimaldi used the previous day. (Nigro Statement ¶ 49; Napolitano Dep. 30.) Plaintiff disputes this testimony as self-serving, and argues that Grimaldi had used so much heroin that Napolitano should not have accepted her statement that she was not using consistently. (Pl.'s Statement 25.) PCCF records suggest that Grimaldi reported consistent use to Stewart. (*See* Stewart Notes (noting that Grimaldi "use[d] 2 bundles [of] IV heroin each day" and "report[ed] no menstrual cycle due to heroin use").) Based on this evidence, a reasonable jury could find that Grimaldi reported to Napolitano that she used heroin consistently, notwithstanding Napolitano's testimony.

Napolitano also testified that Grimaldi told him that "she felt okay" and that "she was not going to hurt herself," (Napolitano Dep. 48–49; Defs.' Statement ¶ 32; Nigro Statement ¶¶ 41–42), that he completed the Screening Guidelines accurately, (Defs.' Statement ¶ 43; Napolitano Dep. 41), and that Grimaldi made no complaints while she was being booked, (Nigro Statement ¶¶ 44, 56; Napolitano Dep. 61). Plaintiff disputes these claims, each time without identifying admissible evidence. (Pl.'s Statement 6, 8, 24, 26.) The Court is unaware of any evidence on the record that could support a reasonable jury finding the opposite. Indeed, circumstantial evidence suggests that Grimaldi was not experiencing withdrawal symptoms at the time of her booking, which is consistent with her statements that she felt okay and did not plan to hurt herself, and with an absence of complaints. (*See* Wilkinson Dep. 44–45 (Grimaldi at booking seemed "more alert" than during prior incarcerations when she was "detoxing"); Stewart Notes (noting at booking "no symptoms now" and that Grimaldi denied "unmanageable depression or anxiety").) Thus, the Court takes these facts to be undisputed for purposes of the instant Motions.

Paperwork from Grimaldi's prior bookings at PCCF was available to Napolitano as he booked Grimaldi.  (Defs.' Statement ¶¶ 14–15, Pl.'s Statement 3–4; Napolitano Dep. 17–18.)  Grimaldi's intake documents from December 2014 say "detoxing," which is underlined.  (Rankin Decl. Ex. 14 ("2014 Intake") 440 (Dkt. No. 136-14).)  They reflect that Grimaldi was incarcerated due to a drug arrest, (*id.* at 451), that she used heroin, suffered from depression and bipolar disorder, and attempted suicide three years prior, (*id.* at 452), that she used three bags of heroin the day prior to her arrest, (*id.* at 455), and that she was an IV drug user, (*id.* at 464).  These intake documents also reflect that Grimaldi's top medical problem was opiate withdrawal, (*id.* at 459), and that she was diagnosed with moderate withdrawal and given medication, (*id.* at 467).  In December 2014, Grimaldi was put on 15-minute watch due to her medical condition.  (*Id.* at 443, 455.)[6]  She was also put on 15-minute watch when booked in July 2012, after reporting that she had used heroin that morning and attempted suicide one year prior.  (Rankin Decl. Ex. 15 ("2012/2013 Intake") 3 (Dkt. No. 136-15).)  The intake officer made the same decision at a second booking in September 2012 "due to possible detox," even though Grimaldi stated that "she [was] not suicidal."  (*Id.* at 52.)  At the September 2012 booking, Grimaldi reported using three bundles (30 bags) of heroin per day and a suicide attempt two years prior.  (*Id.* at 17, 52.)  While incarcerated, Grimaldi wrote notes requesting medical help, noting that she

---

[6] PCCF has three supervision levels: checks every 30 minutes ("routine"), checks every 15 minutes, and constant supervision.  (Defs.' Statement ¶ 11; Pl.'s Statement 3; Napolitano Dep. 18.)  If an inmate is at risk of suicide, a sergeant and the mental health staff must be notified, and the mental health staff will determine whether an inmate is placed on constant supervision.  (Randazzo Decl. Ex. D ("Policies") (Dkt. No. 130-4).)  The Commission of Corrections requires only that correctional facilities consider routine and constant supervision; it does not require that correctional facilities consider checks every fifteen minutes.  (Defs.' Statement ¶ 12; Pl.'s Statement 3; Colello Dep. 24; Smith Dep. 59.)

was depressed, couldn't sleep, and needed medication because she was going crazy.  (*Id*. at 116, 347.)[7]

Napolitano recommended Grimaldi for routine supervision.  (Defs.' Statement ¶ 44; Nigro Statement ¶ 54; Pl.'s Statement 8, 26; 2015 Screening; Napolitano Dep. 31–32.)  There is testimony suggesting that, when an inmate reports that he or she expects to go through withdrawal within two days after booking, he or she is typically placed on constant watch, (*see* Colello Dep. 19; 27–28; Puhekker Dep. 22–23), or at least 15-minute watch, (*see* Randazzo Decl. Ex. N ("Jackson Dep.") 43 (Dkt. No. 130-14); Rankin Decl. Ex. 19 ("McGoorty Dep.") 22–23 (Dkt. No. 136-19)).  Reports of drug use and mental health issues may also make 15-minute watch appropriate.  (*See* Puhekker Dep. 26–27; Giampaolo Dep. 36.)  Additional testimony states that an inmate in active withdrawal would likely be under constant watch. (Smith Dep. 57.)

Jackson was the supervising sergeant during Grimaldi's booking.  (Defs.' Statement ¶ 45; Pl.'s Statement 8; Napolitano Dep. 34; Jackson Dep. 38.)  This means that she was responsible for reading and reviewing the information obtained by Napolitano, and approving his supervision recommendation.  (Spinelli Dep. 16.)  It also means that Jackson had access to the notes and documents related to Grimaldi's prior incarcerations that were contained in the booking file. (Jackson Dep. 16.)  Jackson knew Grimaldi from her prior incarcerations at PCCF.  (Defs.' Statement ¶ 48; Pl.'s Statement 8; Jackson Dep. 36.)  Consistent with PCCF practice, (Defs.' Statement ¶ 17; Pl.'s Statement 4; Spinelli Dep. 22–23), Jackson reviewed Napolitano's recommendation of routine supervision, (Napolitano Dep. 35; Jackson Dep. 40–41).  It is

---

[7] At her booking in 2013, the intake officer failed to note Grimaldi's past suicide attempt and recommended routine supervision.  (Prior Screenings.)

undisputed that Jackson "spoke to . . . Napolitano," and "agreed on a routine supervision." (Jackson Dep. 41; *see also* Defs.' Statement ¶ 50; Pl.'s Statement 9.)  Jackson also testified that she looked at Grimaldi's "suicide screening, her pedigree information and her medical." (Jackson Dep. 40–41.)  Plaintiff disputes this testimony, asserting that "it is slightly unclear what exact documents, if any, Jackson reviewed," (Pl.'s Statement 9), and pointing to Jackson's testimony that she "didn't go through the [booking] folder."  (*Id.*; Jackson Dep. 17; *see also* Defs.' Statement ¶ 49.)  Plaintiff appears to admit that Jackson "reviewed [Grimaldi's] suicide screening, her pedigree, and medical intake."  (Pl.'s Mem. of Law in Opp. to Defs.' Mots. ("Pl.'s Mem.") 7 (Dkt. No. 135).)  Nonetheless, the Court agrees with Plaintiff's claim that the scope of Jackson's review is unclear.  The Court thus does not consider the scope of Jackson's review of the intake file to be undisputed for purposes of resolving the Motions.  Further, a reasonable jury could find that although it was her responsibility to give a briefing at the end of her shift, including when "new commitments . . . needed to be watched," (Jackson Dep. 39–40), Jackson did not give any special instructions regarding Grimaldi to the sergeant who replaced her. (Jackson Dep. 46.)

Consistent with PCCF practice, (Defs.' Statement ¶ 18; Pl.'s Statement 4; Puhekker Dep. 60), Stewart performed the medical portion of the booking, (Defs.' Statement ¶ 51; Nigro Statement ¶ 58; Pl.'s Statement 9, 27; Napolitano Dep. 34; *see, e.g.*, Silverman Decl. Ex. F ("PCCF Med. Records") 4, 11, 13–15 (Dkt. No. 126-6)).[8]  The PCCF medical records suggest that Stewart performed a suicide potential screening, and Grimaldi received a score of two,

---

[8] Because the PCCF medical records do not have consistent page numbers, the Court refers to the ECF-generated page number in the upper right-hand corner of the page.

which did not mandate constant supervision.  (Nigro Statement ¶ 64; Pl.'s Statement 28; PCCF Med. Records 4.)[9]

As noted, Stewart also placed Grimaldi on the COWS protocol.  (Nigro Statement ¶ 69; Pl.'s Statement 28; Diaz Dep. 14.)  The COWS protocol assigns a numeric value to quantify the severity of opiate withdrawal.  (Defs.' Statement ¶ 72; Nigro Statement ¶ 70; Pl.'s Statement 12, 29; Diaz Dep. 14.)  A COWS evaluation is given every eight hours to monitor for changes. (Nigro Statement ¶ 73; Pl.'s Statement 29; Diaz Dep. 16.)  Grimaldi's first COWS protocol score was three, indicating mild withdrawal symptoms.  (Nigro Statement ¶ 71; Pl.'s Statement 29; PCCF Med. Records 16–17.)  Based on Stewart's assessment of the COWS protocol, Grimaldi was given supportive care.  (Nigro Statement ¶ 72; Pl.'s Statement 29; PCCF Med. Records 18.)

Stewart's notes reflect Grimaldi's treatment for her knee laceration, (Defs.' Statement ¶ 52; Pl.'s Statement 9; Stewart Notes), which she acquired "while living out doors (homeless)," (Stewart Notes).  The notes reflect that Grimaldi "use[d] 2 bundles [of] IV heroin each day" and "request[ed] Gatorade, as she suffers dehydration during withdrawal."  (Stewart Notes; Defs.' Statement ¶ 54; Nigro Statement ¶ 62; Pl.'s Statement 10, 27.)  They also say that Grimaldi "report[ed] no menstrual cycle due to heroin use."  (Stewart Notes.)  It is undisputed that Stewart saw no evidence of suicidal ideation, plan, or intent during his exam of Grimaldi.  (Nigro Statement ¶ 63; Pl.'s Statement 27; Stewart Notes; *see also* Defs.' Statement ¶ 55; Pl.'s

---

[9] This screening requires "Yes" or "No" responses for 17 questions or observations. (PCCF Med. Records 4.)  If an inmate receives eight or more "Yes" responses, constant supervision is required.  (*Id.*)  Constant screening is also required if the answer is "Yes" to particular questions, including "[a]rresting or transporting officer believes subject may be suicide risk" and "[e]xpresses thoughts about killing self."  (*Id.*)  Grimaldi received two total "Yes" responses, and received "No" responses to all entries that independently require constant supervision.  (*Id.*)

Statement 10.)[10]  It is also undisputed that Stewart agreed with Napolitano's and Jackson's recommendation of routine supervision, "understanding this issue may need to be revisited if symptoms of withdrawal reemerge."  (Stewart Notes; *see also* Defs.' Statement ¶ 56; Nigro Statement ¶ 65; Pl.'s Statement 10, 28, Napolitano Dep. 35.)

Stewart's notes reflect a series of statements that Plaintiff purports to dispute, including that Grimaldi had "withdrawn from heroin in the past [at PCCF], [was] aware of likely progression & supportive care, [states she] will do fine, [and] ha[d] no symptoms [at the time] but expect[ed] them [the following day]," (Stewart Notes; Defs.' Statement ¶ 53; Nigro Statement ¶¶ 60–61; Pl.'s Statement 9, 27), and that Grimaldi "denie[d] unmanageable depression or anxiety," (Stewart Notes; Defs.' Statement ¶ 55; Pl.'s Statement 10).  For both these sets of statements, Plaintiff replies: "Not disputed that this is an accurate reflection of the record, but disputed Ms. Grimaldi's statement or conclusions about her understanding of the situation."  (Pl.'s Statement 9, 10; *see also id*. at 27 ("disputed as to Ms. Grimaldi's statement that she w[ould] do fine and ha[d] no symptoms").)  Plaintiff does not support her replies with a cite to admissible evidence.  (*Id*.)  The Court is not aware of any evidence that Grimaldi did not make these statements to Stewart.  Indeed, these facts are consistent with circumstantial evidence suggesting that Grimaldi did not experience withdrawal symptoms during booking.  (*See* Wilkinson Dep. 44–45 (Grimaldi at booking seemed "more alert" than during prior incarcerations when she was "detoxing"); Napolitano Dep. 48–49 (Grimaldi at booking reported

---

[10] Plaintiff disputes ¶ 55 of Defendants' Rule 56.1 Statement.  (Pl.'s Statement 10.) However, this assertion is compound, (Defs.' Statement ¶ 55), and Plaintiff only disputes "Grimaldi's statement or conclusions," (Pl.'s Statement 10).  Thus, Stewart's findings are undisputed.

that "she felt okay" and that "she was not going to hurt herself").)  The Court thus takes these

facts as undisputed for purposes of the Motions.

Between 11:15 P.M. and 11:30 P.M. on October 27, 2015, Napolitano was relieved at

intake by Puhekker, (Defs.' Statement ¶ 57; Nigro Statement ¶ 66; Pl.'s Statement 10, 28;

Puhekker Dep. 46; Napolitano Dep. 64), and reported to the South Housing Unit ("SHU"), where

he worked for the next four hours, until 3:30 A.M., (Defs.' Statement ¶ 58; Nigro Statement

¶ 81; Pl.'s Statement 10, 31; Napolitano Dep. 38).  Napolitano did not report his observations of

Grimaldi or her responses to the Screening Guidelines to Pukehher.  (Defs.' Statement ¶ 63; Pl.'s

Statement 11; Pukehher Dep. 46–47.)  During the brief time that Grimaldi was in the booking

room with Pukehher, she made no complaints to him.  (Nigro Statement ¶ 68; Pl.'s Statement 28;

Puhekker Dep. 61.)

Shortly after the shift change, Grimaldi was brought to SHU.  (Defs.' Statement ¶ 65;

Pl.'s Statement 11; Pukehher Dep. 47; Napolitano Dep. 37–38.)  Napolitano testified that, while

he supervised Grimaldi in SHU, she made no requests or complaints, and was observed lying on

the bed.  (Defs.' Statement ¶¶ 66–67; Napolitano Dep. 62.)  Plaintiff disputes these statements,

because "there is no reason to accept Napolitano['s] self-serving testimony."  (Pl.'s Statement

11.)  Plaintiff does not refer to admissible evidence.  (*Id*.)  The Court is not aware of any

evidence that Grimaldi made requests or complaints, or did anything aside from lie in her bed.

Indeed, these facts are consistent with available circumstantial evidence.  (*See* Wilkinson Dep.

44–45 (Grimaldi at booking seemed "more alert" than during prior incarcerations when she was

"detoxing"); Stewart Notes (noting at booking "no symptoms now"); Napolitano Dep. 48–49

(Grimaldi at booking reported that "she felt okay").)  The Court thus takes these facts as

undisputed for purposes of the Motions.

      2.  October 28, 2015

On October 28, 2015, the following day, Nigro worked as the housing officer in SHU from 7:30 A.M. to 3:30 P.M., and also from 3:30 P.M. to 11:30 P.M.  (Defs.' Statement ¶ 68; Nigro Statement ¶¶ 84–85; Pl.'s Statement 12, 31; Randazzo Decl. Ex. U ("Nigro Dep.") 17 (Dkt. No. 130-21).)  Nigro had never received training or worked as an intake officer.  (Nigro Statement ¶ 89; Pl.'s Statement 32; Nigro Dep. 18.)  Grimaldi was already at PCCF when Nigro reported to her shift on October 28, 2015.  (Nigro Statement ¶ 86; Pl.'s Statement 31; Nigro Dep. 29.)  Prior to her shift, Nigro attended a briefing.  (Nigro Statement ¶ 87; Pl.'s Statement 32; Nigro Dep. 29.)  The briefing officer mentioned that Grimaldi was back, but did not mention that she expected to experience withdrawal symptoms.  (Nigro Statement ¶ 87; Pl.'s Statement 32; Nigro Dep. 29–30.)  Nigro, who worked at PCCF from 2005 to April 2017, knew Grimaldi from her prior incarcerations.  (Defs.' Statement ¶¶ 69–70; Nigro Statement ¶¶ 79, 88, Pl.'s Statement 12, 30, 32; Nigro Dep. 16, 26–27.)  Nigro "thought [Grimaldi] was a troubled girl" because "she always came in for drugs."  (Nigro Statement ¶ 90; Pl.'s Statement 32; Nigro Dep. 27.)

Nigro testified to several additional facts that Plaintiff purports to dispute.  She testified that she did not know what drugs Grimaldi was arrested for during her prior incarcerations, that she had not seen Grimaldi experiencing withdrawal symptoms or mental health issues at the jail, that she did not know Grimaldi had previously attempted suicide, and that she was unaware of Grimaldi's bipolar disorder diagnosis.  (Nigro Dep. 27–28; *see* Nigro Statement ¶¶ 90, 92–94.)  Plaintiff purports to dispute these facts, arguing that Nigro's testimony is self-serving.  (*See* Pl.'s Statement 32–33.)  Plaintiff does not identify admissible evidence that contradicts Nigro's testimony.  (*Id*.)  However, Colello testified that he knew Grimaldi to be a heroin user who

suffered from bipolar disorder and had attempted suicide.  (Colello Dep. 42.)[11]  And at least one

other officer testified that she was aware of Grimaldi's bipolar disorder diagnosis.  (Giampaolo

Dep. 47.)  Based on this testimony, the fact that PCCF is a "small jail," (Colello Dep. 43), and

Nigro's testimony that she believed Grimaldi to be "a troubled girl" who "always came in for

drugs," (Nigro Dep. 27), a reasonable jury could find, notwithstanding Nigro's testimony, that

she knew that Grimaldi was a heroin user who had attempted suicide and received a bipolar

disorder diagnosis.  The Court reaches the same conclusion with respect to Nigro witnessing

Grimaldi's prior withdrawal symptoms and mental health ailments.  Grimaldi's intake paperwork

suggests that Grimaldi suffered opiate withdrawal while previously incarcerated and was given

medication.  (2014 Intake 459, 467.)  Intake documents also reflect that Grimaldi made several

requests for medicine that a reasonable jury could find were related to withdrawal.  (*See*

2012/2013 Intake 116, 347.)  And Colello testified that he would expect Grimaldi to report that

she expected withdrawal symptoms, based on his personal knowledge.  (Colello Dep. 49.)  Given

Nigro's prior knowledge of Grimaldi, (Nigro Dep. 26–27), and the fact that PCCF is a "small

jail," (Colello Dep. 43), a reasonable jury could conclude that Nigro had seen Grimaldi

experiencing withdrawal symptoms or mental health issues at PCCF.

Nigro also testified that Grimaldi said her October 27, 2015 arrest was due to marijuana.

(Nigro Dep. 27; *see* Nigro Statement ¶ 91.)  Plaintiff again purports to dispute this fact because

Nigro's testimony is self-serving.  (*See* Pl.'s Statement 32.)  Again, Plaintiff does not identify

admissible evidence.  (*Id.*)  The Court is unaware of any circumstantial evidence that sheds doubt

on Nigro's testimony.  Indeed, evidence suggests that Grimaldi was arrested on a marijuana

---

[11] The Court notes that his knowledge came from booking Grimaldi during a prior incarceration, (Colello Dep. 41), and that Nigro never served as an intake officer, (Nigro Dep. 18).

charge.  (*See* Police Records 806.)  Thus, it is undisputed that Grimaldi reported to Nigro that she was arrested due to marijuana.

That morning, Nigro took Grimaldi to see a nurse at around 10:00 A.M. for a second COWS protocol evaluation.  (Defs.' Statement ¶ 71; Nigro Statement ¶¶ 74, 96; Pl.'s Statement 12, 29, 33; Diaz Dep. 17; Nigro Dep. 32.)  Grimaldi received a score of 7, which was higher than the prior evening, but still in the mild range.  (Nigro Statement ¶ 75; PCCF Med. Records 16–17.)[12]

At 1:00 P.M., Nigro took Grimaldi to the medical unit a second time.  (Defs.' Statement ¶ 73; Nigro Statement ¶ 96; Pl.'s Statement 12, 33; Diaz Dep. 17, Nigro Dep. 32.)  The Parties dispute the reason for her visit.  (*See* Nigro Statement ¶ 76; Pl.'s Statement 29–30.)  Diaz's deposition testimony reflects that Grimaldi "was complaining of urinary issues," that Diaz "asked for a urine sample," and that Grimaldi "came back with her urine sample."  (Diaz Dep. 17.)  Construed in the light most favorable to the Plaintiff, neither this testimony nor Nigro's Rule 56.1 Statement compels the conclusion that the reason Grimaldi returned to see Diaz was "for treatment of a urinary tract infection."  (Nigro Statement ¶ 76.)  Returning the urine sample may have been incidental to the ultimate purpose of her visit.

During her second visit to the medical unit, Grimaldi requested Clonidine.  (Defs.' Statement ¶ 74; Nigro Statement ¶ 77; Pl.'s Statement 12–13, 30; Diaz Dep. 19.)  Clonidine is a blood pressure medication used to treat withdrawal symptoms.  (Nigro Statement ¶ 78; Pl.'s Statement 30; Diaz Dep. 19.)  The Parties dispute the motivation for her request.  Defendants

---

[12] Plaintiff fails to indicate whether she disputes this factual assertion.  (*See* Pl.'s Statement 29.)  It is supported by the record.  (*See* PCCF Med. Records 16–17.)  Thus, the Court takes it to be undisputed.  *See Elwell v. Selective Ins. Co. of Am.*, No. 14-CV-2590, 2016 WL 5928682, at *1 (D.N.J. Oct. 11, 2016).

identify testimony that she requested Clonidine for "later that night, if she needed it."  (Diaz Dep. 19; *see also* Defs.' Statement ¶ 74.)  Plaintiff states that the fact that Grimaldi began to experience acute distress fewer than two hours later suggests that she may have expected withdrawal symptoms sooner than that night.  (Pl.'s Statement 12–13; *see* Rankin Decl. Ex. 17 ("Loria Statement") (Dkt. No. 136-17).)  But Plaintiff introduces no reason to doubt Diaz's testimony, as she is not named as a Defendant.  *Contra O'Bert*, 331 F.3d at 37.  More importantly, the statement by Grimaldi's cell neighbor Renee Loria ("Loria") is consistent with Diaz's testimony.  It suggests that Grimaldi began experiencing withdrawal symptoms at around 2:45 P.M., more than an hour after requesting Clonidine.  (*See* Loria Statement.)  The statement does not suggest that Loria noticed Grimaldi experiencing withdrawal symptoms when Loria returned to her cell at approximately 2:30 P.M., at which point Grimaldi was already in her cell next door.  (*Id.*)  And all available circumstantial evidence suggests that Grimaldi was not experiencing withdrawal symptoms prior to that time.  (*See, e.g.*, Colello Dep. 50 (Grimaldi "appeared normal, she was laughing and joking with the other inmates"); Nigro Dep. 33 (Grimaldi did not on October 28, 2015 express a concern that she was going to experience withdrawal symptoms).)  Thus, the Court accepts as undisputed Diaz's testimony that Grimaldi requested Clonidine for later that night.  (*See* Diaz Dep. 19.)  There is no document in the record suggesting that Grimaldi received Clonidine.  (Rankin Decl. ¶ 26.)

At some point on October 28, 2015, Nigro took Grimaldi outside to the recreation yard to smoke a cigarette.  (Defs.' Statement ¶ 76; Nigro Statement ¶¶ 96–97; Pl.'s Statement 13, 33; Colello Dep. 50, Nigro Dep. 32, 45.)  Grimaldi undisputedly told Colello, who was supervising the yard, that she was incarcerated for drugs and "she was changing her life this time."  (Defs.' Statement ¶¶ 77, 82; Nigro Statement ¶ 100; Pl.'s Statement 13, 14, 34; Colello Dep. 50–51.)

Colello, who was supervising the recreation yard, testified that Grimaldi "appeared normal, she was laughing and joking with the other inmates." (Colello Dep. 50; *see* Defs.' Statement ¶ 80; Nigro Statement ¶ 99.) Plaintiff purports to dispute Colello's testimony about Grimaldi's appearance, stating "Not disputed that this is an accurate reflection of the record or testimony, but disputed Ms. Grimaldi's statement or conclusions about her understanding of the situation." (Pl.'s Statement 13.) This does not suggest a factual dispute because what Colello observed is unrelated to Grimaldi's statements or conclusions. Plaintiff separately asserts that Colello's testimony is self-serving. (*Id.* at 34.) Plaintiff does not support her replies with admissible evidence that raises doubt about Colello's testimony, (*id.* at 13, 34), and the Court is not aware of any. Indeed, Colello's testimony is consistent with available circumstantial evidence. (*See* Diaz Dep. 19 (Grimaldi requested Clonidine for "later that night, if she needed it"); Nigro Dep. 33 (Grimaldi did not on October 28, 2015 express a concern that she was going to experience withdrawal).) Loria indicated that she returned to her cell at roughly 2:30 P.M., and heard Grimaldi moaning at roughly 2:45 P.M. (Loria Statement.) This is consistent with Colello's testimony; it suggests that Grimaldi began to experience acute withdrawal symptoms after returning to her cell. (*Id.*) The Court thus takes these facts as undisputed for purposes of the Motions.

Grimaldi was returned to her cell. (Defs.' Statement ¶ 83; Pl.'s Statement 14; Nigro Dep. 33.) Nigro last interacted with Grimaldi prior to locking her in. (Nigro Statement ¶ 102; Pl.'s Statement 34; Nigro Dep. 33.) Nigro testified that Grimaldi did not on October 28, 2015 express a concern that she was going to experience withdrawal. (Nigro Dep. 33; *see* Nigro Statement ¶ 101.) Plaintiff disputes "Grimaldi's statement or conclusions about her understanding of the situation." (Pl.'s Statement 34.) This does not suggest a factual dispute, because Nigro testified

to the absence of any statement from Grimaldi.  In addition, Plaintiff does not identify admissible

evidence to support the contrary assertion, (*id.*), and, as discussed, available circumstantial

evidence is consistent with Nigro's testimony.  Thus, the Court takes Nigro's testimony as

undisputed.

Grimaldi began moaning and moving around in her sheets at approximately 2:45 P.M.

(Loria Statement.)  Grimaldi stated that she was "detoxing."  (*Id.*)  Several minutes later,

Grimaldi stated "I can't do this," and twice yelled "Ms. Nigro," then started banging on the bars

on the gate to her cell.  (*Id.*)  At that point, Grimaldi went silent for a period of approximately 15

minutes.  (*Id.*)  Nigro testified that she did not hear Grimaldi cry for help.  (Nigro Dep. 36; *see*

*also* Nigro Statement ¶ 104.)  Plaintiff disputes this testimony as self-serving, but does not

identify any circumstantial evidence that casts doubt on it.  (Pl.'s Statement 34.)  Nor is the Court

aware of any.  Indeed, Nigro's emotional response to Grimaldi's suicide attempt is consistent

with her testimony, because it suggests that she did not expect Grimaldi to have attempted

suicide.  (*See* Nigro Dep. 38.)  Thus, the Court accepts Nigro's testimony that she did not hear

Grimaldi cry for help as undisputed.

At approximately 3:18 P.M., Cassidy, who had replaced Nigro as SHU housing officer,

observed Grimaldi hanging in her cell by a bed sheet.  (Defs.' Statement ¶ 87; Nigro Statement

¶ 105; Pl.'s Statement 14, 35; Randazzo Decl. Ex. Q ("Cassidy Dep.") 49 (Dkt. No. 130-17).)

Upon learning of Grimaldi's attempted suicide, Nigro started crying and was overwhelmed

because she "never knew that could happen."  (Nigro Statement ¶ 107; Pl.'s Statement 35; Nigro

Dep. 38.)  Video of PCCF shows that Nigro last saw Grimaldi approximately 40 minutes before

she was discovered by Cassidy, at roughly 2:40 P.M.  (Pl.'s Statement 36; Rankin Decl. Ex. 23

("Video") (Dkt. No. 136-25); Smith Dep. 147–48; Rankin Decl. ¶ 28.)[13]  Based on the video, a reasonable jury could find that Nigro inaccurately noted performing a cell check at 3:00 P.M., and inaccurately testified to performing timely checks every thirty minutes.  (Pl.'s Statement 36; Smith Dep. 147–48; Video; Rankin Decl. Ex. 25 ("Cell Log") (Dkt. No. 136-25); Nigro Dep. 78.)

Grimaldi was transported to the hospital via ambulance.  (Defs.' Statement ¶ 106; Pl.'s Statement 17; Colello Dep. 68.)  She died on May 13, 2016 after life support was removed. (Defs.' Statement ¶ 2; Pl.'s Statement 1; SAC ¶ 2; Randazzo Decl. Ex. Y ("Lara-Grimaldi Dep.") 125 (Dkt. No. 130-25).)

B.  Procedural Background

The Court has issued two prior Opinions in this Action, one on March 29, 2018, (Op. & Order ("2018 Op.") (Dkt. No. 43)), and the other on August 1, 2019, (2019 Op.).  The Court assumes familiarity with the procedural history as discussed in these Opinions.

On October 23, 2019, Defendants notified the Court that they consented to Plaintiff's proposal to bifurcate this Action.  (Dkt. No. 114.)  Under Plaintiff's proposal, expert discovery on her *Monell* claim would be delayed until after the Court ruled on the Individual Defendants' putative motions for summary judgment.  (*Id.*)  The Court approved this plan as well as Defendants' proposed schedule for submitting pre-motion letters.  (Dkt. No. 115.)  On November 6, 2019, Nigro submitted a pre-motion letter regarding her putative motion for summary judgment, (Dkt. No. 116), and the County Defendants did the same, (Dkt. No. 117).  Plaintiff

---

[13] After several inquiries to Counsel, the Parties after two months were unable to produce the video of PCCF in a format that could be viewed by the Court.  As a result, for purposes of the Motions, the Court took Plaintiff's word regarding the video's contents.  (*See* Pl.'s Statement 36.)

replied on November 13, 2019.  (Dkt. No. 118.)  After one adjournment at the Parties' request, (*see* Dkt. No. 121), the Court on January 21, 2020 held a pre-motion conference and adopted a briefing schedule, (Dkt. (minute entry for January 21, 2020); Dkt. No. 123).  On March 13, 2020, Nigro submitted her Motion For Summary Judgment.  (Not. of Nigro Mot.; Silverman Decl.; Nigro Statement; Mem. of Law in Supp. of Nigro's Mot. ("Nigro Mem.") (Dkt. No. 128).)  The County Defendants did the same.  (Not. of Mot.; Randazzo Decl.; Mem. of Law in Supp. of County Defs.' Mot. ("Defs.' Mem.") (Dkt. No. 131); Defs.' Statement.)  On May 26, 2020, Plaintiff opposed the Motions.  (Pl.'s Mem.; Rankin Decl.; Pl.'s Statement.)  On June 8, 2020, Nigro and the County Defendants submitted their reply briefs.  (Reply Mem. of Law in Further Supp. of Nigro Mot. ("Nigro Reply") (Dkt. No. 138); Reply Mem. of Law in Further Supp. of the County Defs.' Mot. ("Defs.' Reply") (Dkt. No. 139).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis[14]

The Court finds that Defendants are entitled to summary judgment on Plaintiff's deliberate indifference claim.  It defers ruling on whether Defendants are entitled to summary judgment on Plaintiff's state law claims pending a determination of whether Plaintiff's *Monell* claim will proceed to trial.

1.  Deliberate Indifference

Because Grimaldi was a pre-trial detainee rather than a convicted prisoner at the time she was denied adequate medical care, (*see* SAC ¶¶ 34, 101), Plaintiff's claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment," *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).[15]  A

---

[14] Plaintiff does not contest that Spinelli, Wilkinson, Puhekker, and Cassidy were not personally involved with Grimaldi during the booking or suicide risk evaluation processes, nor does Plaintiff argue that they learned of any information from which an officer could reasonably conclude that Grimaldi's medical condition posed an excessive risk to her health or safety.  (*See* Defs.' Mem. 10; Defs.' Reply 1; *see generally* Pl.'s Mem.)  Thus, the Court deems these claims to be abandoned, grants summary judgment for Spinelli, Wilkinson, Puhekker, and Cassidy, and dismisses all claims against them.  *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

[15] Until the not-too-distant past, "[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody [were] analyzed under the same standard irrespective of whether they [we]re brought under the Eighth or Fourteenth Amendment."

pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

"'While in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide' resulting from a pre-existing mental health disorder." *Case v. Anderson*, No. 16-CV-983, 2017 WL 3701863, at *8 (S.D.N.Y. Aug. 25, 2017) (alteration omitted) (quoting *Kelsey v. City of New York*, 306 F. App'x 700, 702 (2d Cir. 2009) (summary order)). "'A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement'—such as the denial of mental health care—'by showing that the officers acted with deliberate indifference to the challenged conditions.'" *Id.* (quoting *Kelsey*, 306 F. App'x at 702). To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that the "deprivation of medical care . . . [was] 'sufficiently serious,'" and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.'" *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127,

---

*Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009), *overruled by Darnell*, 849 F.3d 17. However, the Second Circuit's decision in *Darnell*, 849 F.3d 17, overruled *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Darnell*, 849 F.3d at 35.

138 (2d Cir. 2013) (citation and quotation marks omitted).  Defendants do not contest this

requirement for purposes of the Motions.  (*See* Defs.' Mem. 9; Nigro Mem. 7.)

The second requirement is the "mens rea prong."[16]  "Prior to the Second Circuit's

decision in *Darnell*, 849 F.3d 17, the second element—whether the defendant acted with a

sufficiently culpable state of mind—was evaluated subjectively."  *Ryan v. County of Nassau*, No.

12-CV-5343, 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018).  However, in *Darnell*, in light of

the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Second

Circuit held that when a claim arises under the Fourteenth Amendment, "the pretrial detainee

must prove that the defendant-official acted intentionally" in depriving adequate medical care "or

recklessly failed to act with reasonable care . . . even though the defendant-official knew, or

should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849

F.3d at 35; *see also Ryan*, 2018 WL 354684, at *3 (same); *Charles v. County of Orange*, No. 16-

CV-5527, 2017 WL 4402576, at *10 (S.D.N.Y. Sept. 29, 2017) (same), *vacated and remanded

on other grounds*, 925 F.3d 73 (2d Cir. 2019).  "In other words, the second element of a

deliberate indifference claim under the Fourteenth Amendment 'is defined objectively,' and a

plaintiff is not required to show subjective awareness by the defendant that '[his] acts (or

omissions) have subjected the pre-trial detainee to a substantial risk of harm.'"  *Ryan*, 2018 WL

354684, at *3 (quoting *Darnell*, 849 F.3d at 35).[17,18]  The Court "must make this determination

---

[16] In *Darnell*, the Second Circuit indicated that this prong should be referred to the "mens rea prong," rather than the subjective prong, to prevent confusion.  *See Darnell*, 849 F.3d at 32 (italics omitted).

[17] "Although *Darnell* did not specifically address medical treatment, the same principle applies here."  *Charles*, 925 F.3d at 87.

[18] The Court thus rejects Nigro's statement that, in order to establish a claim for deliberate indifference, "she must . . . [have] draw[n] the inference" of a substantial risk of serious harm.  (*See* Nigro Mem. 10.)

from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397; *see also Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018) (summary order) (finding that *Kingsley* established "an 'objective' standard, i.e., whether a 'reasonable person' would appreciate the risk to which the detainee was subjected" (italics omitted)).[19]  Despite the less demanding standard articulated in *Darnell*, which is akin to objective recklessness, "any § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." *Smith*, 2017 WL 4417699, at *3 (quoting *Darnell*, 849 F.3d at 36) (italics omitted); *see also Ryan*, 2018 WL 354684, at *3 (same); *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at *4 (S.D.N.Y. May 24, 2017) (same).  "A detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36.

In inmate suicide cases, deliberate indifference arises "under one of two broad fact situations." *Rellergert v. Cape Girardeau County*, 924 F.2d 794, 796 (8th Cir. 1991).  "First is a suicide or attempt that occurs when jailers failed to discover the decedent's suicidal tendencies. Second is a suicide or attempt that occurs when jailers have discovered the tendencies and have

---

[19] In evaluating officers' subjective awareness, "[a] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *See Charles*, 925 F.3d at 87 (quoting *Farmer*, 511 U.S. at 842).  (*See also* Pl.'s Mem. 18.)  At least one court has held that the plaintiff must show that the risk was obvious to satisfy *Darnell*'s objective requirement.  *See Shimmel v. Moody*, No. 18-CV-13334, 2020 WL 555281, at *6 (E.D. Mich. Feb. 4, 2020); *see also Van Hoven v. City of New York*, No. 16-CV-2080, 2018 WL 5914858, at *9 (S.D.N.Y. Aug. 21, 2018) (finding, in evaluating a *Monell* claim, that "a defendant can be on constructive notice of a dangerous condition, if the condition is obvious" and that, to satisfy *Darnell*'s "knew or should have known" requirement, "a pretrial detainee need only allege facts from which the municipality's 'constructive' notice of unconstitutional conditions could be reasonably inferred"), *report and recommendation adopted*, 2018 WL 4417842 (S.D.N.Y. Sept. 17, 2018).  As this interpretation would eliminate any substantive difference between the pre- and post-*Darnell* standard, the Court does not adopt it, and applies the reasonable officer test as discussed in *Kingsley*.

taken preventive measures." *Id.* (footnote omitted); *see also Kelsey v. City of New York*, No. 03-CV-5978, 2006 WL 3725543, at *5 (E.D.N.Y. Dec. 18, 2006) (same), *aff'd*, 306 F. App'x 700 (2d Cir. 2009).  Here, Plaintiff's claim fits the first of these fact situations.  Napolitano, Jackson, and Nigro all offered testimony suggesting that they did not believe Grimaldi was a suicide risk. (Napolitano Dep. 49 (Grimaldi stated "she was not going to hurt herself"); Jackson Dep. 41 (Jackson at no point thought Grimaldi needed more than routine supervision); Nigro Dep. 38 (Nigro "never knew that [Grimaldi's suicide attempt] could happen").)  And Defendants do not argue that routine supervision and placement in the COWS protocol, standing alone, were reasonable preventative measures for an inmate with suicidal tendencies.  (*See generally* Defs.' Mem.; Nigro Mem.; *see also* Pl.'s Mem. 13 (arguing that Defendants "did not do anything to protect Ms. Grimaldi").)  Thus, the Motions turn on whether a reasonable jury could find that Defendants should have known of an excessive risk that Grimaldi would attempt suicide.  *See Darnell*, 849 F.3d at 35.[20]

No reasonable jury could so find.  The undisputed evidence—including the suicide screening form, medical intake records, and medical records from the hospital—indicate that Grimaldi denied suicidal thoughts.  (*See* 2015 Screening; Stewart Notes; PHC Records 11, 44.) *Cf. Ryan*, 2018 WL 354684, at *6 (finding insufficient evidence that the defendant should have been aware of the risk of suicide where the victim "did not indicate . . . that he was thinking about suicide or had attempted suicide in the past").  The undisputed evidence further demonstrates that Grimaldi behaved normally, both at intake and on the following day prior to

---

[20] The Court groups together Napolitano, Jackson, and Nigro for purposes of this analysis.  While they played different roles, a reasonable jury could find that they knew or should have known of similar facts, including Grimaldi's risk of experiencing withdrawal symptoms, bipolar disorder, and suicide attempt four years prior.  *See supra* Section I.A.

her attempted suicide.  (*See* Wilkinson Dep. 44–45 (Grimaldi seemed "more alert" at intake);

Napolitano Dep. 48–49 (Grimaldi at intake said "she felt okay" and "she was not going to hurt

herself"); Stewart Notes (noting "no symptoms now" at booking and that Grimaldi denied

"unmanageable depression or anxiety"); Colello Dep. 50 (Grimaldi "appeared normal" and "was

laughing and joking" the following day).)  Absent "impermissible judicial hindsight," such

normal behavior does not suggest a risk of suicide.  *Belcher v. Oliver*, 898 F.2d 32, 35 (4th Cir.

1990) (finding no deliberate indifference where the victim "was in good spirits, singing, clapping

his hands and humming").  Where courts have found that a jury could hold that officers should

have known of the risk of suicide, there was evidence of more concerning behavior.  *See, e.g.,*

*Dimitris v. Lancaster Cnty. Prison Bd.*, No. 00-CV-3739, 2002 WL 32348283, at *5 (E.D. Pa.

June 7, 2002) (finding at summary judgment that a jury could hold that the defendants should

have known of the risk of suicide where the victim "was known to have intentionally run head-

first into a wall and attempted flooding his cell, among other behaviors, and had scars suggesting

attempted self-harm on his arms"); *see also Case*, 2017 WL 3701863, at *13 (allowing a case to

proceed to discovery where the plaintiff alleged that the victim had "prior mental health

issues, . . . bipolar disorder, [exhibited] strange behavior, and [stated] that he had 'escaped' from

a hospital").

      Grimaldi's other characteristics did not suggest a significant risk of suicide.  As

discussed, a reasonable jury could find that Defendants knew or should have known that

Grimaldi suffered from bipolar disorder and had attempted suicide four years prior.  (*See* 2015

Screening (reporting bipolar disorder and prior suicide attempt to Napolitano); Colello Dep. 42–

43 (officer knew of bipolar disorder and prior suicide attempt, and PCCF is "a small jail"); Nigro

Dep. 27 (Grimaldi was "a troubled girl" who "always came in for drugs").)  However, "treatment

for depression" and a single prior suicide attempt "some [four] years in the past" does not establish a high risk of suicide. *Shimmel*, 2020 WL 555281, at *5 (citing *Mantell v. Health Prof'ls. Ltd.*, 612 F. App'x 302, 307 (6th Cir. 2015)); *cf. Greenway v. S. Health Partners, Inc.*, 827 F. App'x 952, 961 (11th Cir. 2020) (finding no deliberate indifference under the subjective standard where the defendant "knew about [the victim's] previous suicide attempt . . . four years earlier," and the victim "did not exhibit any signs suggesting a risk of suicide"); *Hahn v. Horry County*, No. 11-CV-2840, 2012 WL 3096034, at *5 (D.S.C. July 3, 2012) (finding no deliberate indifference due to delay in providing mental health medication to a plaintiff that "reported a suicide attempt many years ago, [where] he repeatedly denied present suicidal ideations" and "appeared to be in no acute distress"), *report and recommendation adopted*, 2012 WL 3096042 (D.S.C. July 30, 2012).  Indeed, "case law indicates that a strong likelihood of suicide does not exist unless the prior threat or attempt was somewhat recent."  *Holland v. City of Atmore*, 168 F. Supp. 2d 1303, 1313 (S.D. Ala. 2001), *aff'd*, 37 F. App'x 505 (11th Cir. 2002) (alterations and citation omitted); *cf. Lambert v. City of Dumas*, 187 F.3d 931, 938 (8th Cir. 1999) (holding that "any inference of suicidal tendencies that could be drawn from" a possible attempt to self-harm "would be extremely tenuous" because "[m]ore than three years had elapsed").  Thus, no reasonable jury could find that awareness of Grimaldi's bipolar disorder and prior suicide attempt four years earlier would, without more, indicate a significant risk of suicide to a reasonable officer.

In addition, a reasonable jury could find that Defendants knew or should have known that Grimaldi was at risk of withdrawal.  (Colello Dep. 49 (officer would have expected Grimaldi to experience withdrawal symptoms), 43 (PCCF is "a small jail"); Stewart Notes (Grimaldi expected withdrawal symptoms); 2015 Intake 523 (Grimaldi was detoxing upon admission);

Napolitano Dep. 30 (Napolitano understood the 20 bags of heroin used by Grimaldi the day prior to her booking to be a "significant amount").)  However, at least one other circuit has "repeatedly held that the increased risk of suicide due to . . . drug withdrawal cannot support a deliberate indifference claim" because withdrawal "[does] not demonstrate a strong likelihood of a particular vulnerability to suicide."  *Ferencz v. Medlock*, No. 11-CV-1130, 2014 WL 3339639, at *4 (W.D. Pa. July 8, 2014) (citing *Woloszyn v. County of Lawrence*, 396 F.3d 314, 322–23 (3d Cir. 2005)); *see also Broughton v. Premier Health Care Servs., Inc.*, 656 F. App'x 54, 57 (6th Cir. 2016) (holding that "complaints of withdrawal symptoms . . . did not clearly indicate a risk of self-harm"); *Crowell v. Cowlitz County*, No. 14-CV-5153, 2015 WL 6550729, at *3 (W.D. Wash. Oct. 28, 2015) (finding no deliberate indifference where "[w]hile drug and alcohol withdrawal is cause for concern, . . . [the victim] did not exhibit any symptoms of mental health issues during the time of his incarceration").  Thus, no reasonable jury could find that awareness that Grimaldi expected withdrawal symptoms would, without more, indicate a significant risk of suicide to a reasonable officer.

In putting together these factors, the Court finds instructive *Silvera v. Department of Corrections*, No. 09-CV-1398, 2012 WL 877219 (D. Conn. Mar. 14, 2012).  Applying the pre-*Darnell* subjective standard, the court found that the risk of suicide was not "obvious" enough to entail deliberate indifference where, notwithstanding his "history of depression and prior suicide attempts," the victim "denied suffering from any suicidal or homicidal ideation" and "was largely stable and not experiencing a heightened state of depression."  *Id.* at *11.  While the court in *Silvera* applied the more demanding subjective standard, it granted summary judgment despite evidence that the victim was "punching himself in the face and banging and screaming at his cell door" a week or so before committing suicide, and had asked "how to hang himself" the day

before committing suicide.  *Id.* at \*11–12.  Here, the Court is unaware of any evidence that Grimaldi acted in a similarly concerning manner.  *See also A.H. v. St. Louis County*, 891 F.3d 721, 727 (8th Cir. 2018) (affirming summary judgment on a deliberate indifference claim where a health care provider found the victim "presented a low risk of harm to himself" because he "denied suicidal ideation during the interview, did not present any outward signs of depression, and lacked indicators of suicide risk such as psychotic behavior," notwithstanding, among other factors, "a previous suicide attempt, history of drug use[,] and depression").

Further, because it was reasonable for Defendants to find no significant risk of suicide, Jackson and Napolitano did not violate the Constitution by not informing the next shift about Grimaldi's expected withdrawal symptoms.  *See Shimmel*, 2020 WL 555281, at \*8 (finding, where the materials available to the defendants "suggested that [the victim] was not suicidal," that "not communicating more with an officer cannot amount to recklessly disregarding a strong likelihood of a suicide attempt").  The same is true for Jackson's failure to review Grimaldi's file, because "reviewing the [booking folder] would not have alerted a reasonable person to a strong likelihood of suicide."  *Id.* at \*7.

Plaintiff could prove that Defendants departed from PCCF's typical standard of care, including by recommending less than constant monitoring for an inmate who reported expecting withdrawal symptoms, (Colello Dep. 19), and failing to perform checks every 30 minutes, (Napolitano Dep. 18).  "However, this testimony supports, at most, a finding of negligence . . . , and it is well established that negligence cannot form the basis of a deliberate indifference claim."  *Ryan*, 2018 WL 354684, at \*7.  Specific case law states that the failure to conduct routine checks as required is mere negligence.  *See Shimmel*, 2020 WL 555281, at \*8 (finding, because "[a]n officer cannot be held liable for recklessly disregarding a risk about which he did

not know and should not have known," that failing to visit the victim for 44 minutes "at most amounts to negligence rather than recklessness"); *see also Brock v. Logsdon*, No. 19-CV-6082, 2019 WL 6841544, at *6 (W.D.N.Y. Dec. 16, 2019); *Hopson v. Cheltenham Twp.*, No. 90-CV-587, 1990 WL 102883, at *7 (E.D. Pa. July 17, 1990); *Williams v. City of Lancaster*, 639 F. Supp. 377, 383–84 (E.D. Pa. 1986).  Indeed, one court found that the fact that an officer fell asleep while monitoring a prisoner on suicide watch "constitutes, at best, negligence and does not evince the sufficiently culpable state of mind required" to make out a deliberate indifference claim.  *See Patterson v. Labella*, No. 12-CV-1572, 2014 WL 4892895, at *16, *18 (N.D.N.Y. Sept. 30, 2014), *aff'd*, 641 F. App'x 89 (2d Cir. 2016).  The case cited by Plaintiff does not distinguish negligence from recklessness, and simply states that police regulations can be relevant to a constitutional ruling on excessive force.  *Brown v. City of New York*, 798 F.3d 94, 101 n.11 (2d Cir. 2015).  (*See* Pl.'s Mem. 20.)[21]

### 2.  State Law Claims

Plaintiff alleges four claims under state law: negligence, wrongful death, respondeat superior, and a violation of Article I § 12 of the New York State Constitution.  (*See* SAC ¶¶ 123–38.)  Although it was "not briefed by the parties," the Court "consider[s] first whether [P]laintiff's state law claims fall within the Court's supplemental jurisdiction[.]"  *See SST Glob. Tech., LLC v. Chapman*, 270 F. Supp. 2d 444, 455 (S.D.N.Y. 2003).  Because the scope of its supplemental jurisdiction may hinge on whether Plaintiff's *Monell* claim proceeds to trial, the Court defers ruling on the Motions with respect to Plaintiff's state law claims.

---

[21] Because Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment deliberate indifference claim, the Court does not consider their argument that they are entitled to qualified immunity.  (*See* Nigro Mem. 15–19; Defs.' Mem. 12–13.)

The Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a). "Claims are part of the same case or controversy if they derive from a common nucleus of operative fact[s]." *SAT Int'l Corp. v. Great White Fleet (US) Ltd.*, No. 03-CV-7481, 2006 WL 661042, at *5 (S.D.N.Y. Mar. 16, 2006). The Court under some circumstances has discretion to decline supplemental jurisdiction. *See* 28 U.S.C. § 1367(c). "[W]here . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *Masciotta v. Clarkstown Cent. Sch. Dist.*, 136 F. Supp. 3d 527, 548 (S.D.N.Y. 2015) (quoting *Klein & Co. Futures, Inc. v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006)).

Here, Plaintiff maintains a *Monell* claim. (*See* Dkt. No. 114 (indicating bifurcation of *Monell* claim and claims against Individual Defendants); Defs.' Mem. 1 (same).) It is plausible that granting summary judgment for the Individual Defendants will prevent Plaintiff from maintaining her *Monell* claim. *See Johnson v. City of New York*, No. 06-CV-630, 2010 WL 2771834, at *12 (E.D.N.Y. July 13, 2010); *Murphy v. Emme*, No. 93-CV-79-SD, 1994 WL 269276, at *9 (D.N.H. June 14, 1994). However, this issue has not been briefed, and "*Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability." *Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999).

The Court's ruling on whether to decline supplemental jurisdiction over Plaintiff's state law claims may hinge on whether her *Monell* claims should be tried. If Plaintiff's *Monell* claim—her sole remaining federal claim—is "dismissed before trial . . . the state claims should

be dismissed as well." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir.

2008) (ellipses in original) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726

(1966)).  By contrast, if Plaintiff's *Monell* claim is tried, it would share with her state law claims

"a common nucleus of operative fact"—Grimaldi's attempted suicide.  *Delaney v. Bank of Am.*

*Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522

U.S. 156, 165 (1997)); *see* 28 U.S.C. § 1367(a).  As a result, the Court would have supplemental

jurisdiction pursuant to 28 U.S.C. § 1367(a), and could decline such jurisdiction only within its

discretion pursuant to 28 U.S.C. § 1367(c).  *See Catzin v. Thank You & Good Luck Corp.*, 899

F.3d 77, 85 (2d Cir. 2018) ("In order for a district court to decline to exercise supplemental

jurisdiction, where section 1367(a) is satisfied, the discretion to decline supplemental jurisdiction

is available only if founded upon an enumerated category of subsection 1367(c)." (citation,

emphasis, and quotation marks omitted)).

    Thus, pending a determination of whether the *Monell* claim will proceed to trial, the

Court defers ruling on the Motions insofar as they relate to Plaintiff's state law claims.  Courts

routinely defer ruling on motions for summary judgment where the outcome may hinge on the

outcome of a separate issue.  *See Xenia Rural Water Dist. v. City of Johnston*, 467 F. Supp. 3d

696, 717 (S.D. Iowa 2020) (invoking the court's "broad discretion to defer ruling on a motion for

summary judgment as to affirmative defenses" where the outcome of a pending motion may have

affected the court's ruling) (collecting cases); *Clute v. Davenport Co.*, 116 F.R.D. 599, 599–600

(D. Conn. 1987) (deferring ruling on a motion for summary judgment "until after the statute of

limitations issue is decided") (collecting cases).  As discussed, this is such a case because

whether Plaintiff may try her *Monell* claim could determine whether the Court has supplemental

jurisdiction over her state law claims.  *See Duravest, Inc. v. Viscardi, A.G.*, No. 07-CV-10590,

2008 WL 1742845, at *3 (S.D.N.Y. Apr. 14, 2008) (deferring a ruling on a motion to dismiss state law claims or, in the alternative, dismiss for lack of supplemental jurisdiction "until after the [c]ourt has determined whether federal claims will proceed against any of the other defendants"); *cf. Lora v. Centralized Mgmt. Serv., Inc.*, No. 18-CV-4253, 2020 WL 3173025, at *4 n.2 (S.D.N.Y. June 12, 2020) (deferring ruling on supplemental jurisdiction until after the plaintiff has repleaded her federal claims).

### III.  Conclusion

For the foregoing reasons, the Motions are granted in part and deferred in part.  The Court grants the Motions with respect to Plaintiff's deliberate indifference claim.  It defers considering the Motions with respect to Plaintiff's state law claims.  The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 125, 129).  The Parties are to propose an approach to adjudicating Plaintiff's *Monell* claim by April 13, 2021.

SO ORDERED.

DATED:        March  29, 2021
              White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE